### RECTOR v. UNITED STATES et al.

Circuit Court of Appeals, Eighth Circuit.
May 28, 1927.

No. 7172.

**1. Receivers ⟨⟩16—Appointment of receiver held justified in action involving rights of various persons to oil lands of river bed.**

In suit by the United States, as trustee and guardian of Indians, against certain lessees of state of Oklahoma, to determine title to oil lands in bed of river traversing land formerly belonging to Indians, where rights of lessees of state and of allottees of adjoining uplands were involved, and where immediate development was necessary by reason of development proceeding, or threatened, on adjoining lands, *held*, appointment of receiver was justified, if not actually required.

**2. Receivers ⟨⟩92—Court, appointing receiver to conserve oil properties, properly directed receiver to proceed with development under leases already made.**

Court, appointing receiver in action involving rights of numerous claimants to oil lands in river bed, *held* within its discretion in directing receiver to develop property by proceeding under leases already made, and impounding royalties for benefit of whoever might be entitled thereto.

**3. Receivers ⟨⟩92—Court appointing receiver to conserve and develop oil rights held empowered to take oil through medium of leases, validity of which was in dispute.**

In suit involving rights of numerous claimants to oil lands in river bed, court appointing receiver had power, for purpose of conserving it, to take oil through the medium of existing leases, validity of which was in dispute.

**4. Receivers ⟨⟩92—Receiver appointed to conserve oil properties held not appointed for sole purpose of impounding royalties under existing leases, as affecting rights of successful claimant against lessees, who continued development under receiver.**

In suit involving rights of numerous claimants to oil lands in river bed, appointment of receiver *held* not for sole purpose of impounding royalties accruing under existing leases, as affecting rights of successful claimant against prior lessees, under whose invalid leases property was developed by receiver.

**5. Receivers ⟨⟩92—Orders reducing royalties payable to receiver of oil lands held not invalid as to claimant who, when intervening, expressly approved appointment of receiver and method of development.**

In suit involving rights of numerous claimants of oil lands in river bed, where court appointed receiver to take charge of and develop property under existing leases, impounding royalties for benefit of persons entitled thereto, *held*, on appeal by one successful claimant, complaining of amount of royalties awarded her, orders reducing royalties payable under existing leases on lands of such claimant were not invalid, on theory that claimant was not party to lease or order reducing royalty; claimant at time of intervening having expressly accepted and approved appointment of receiver and method of development (through existing leases) then in force.

**6. Receivers ⟨⟩92—Court, in suit involving conflicting oil claims to prevent waste, may take oil from undeveloped lands, even against will of owner.**

Court, in suit involving rights of numerous claimants of oil lands being developed by receiver, has right, in order to prevent waste, to take oil from undeveloped lands, even against will of owner.

**7. Parties ⟨⟩47—Intervener in action becomes party thereto, with all rights, burdens, and subject to all legal consequences, inhering in such status.**

One intervening in an action becomes a party thereto, clothed with all the rights, and burdened with all the duties, and subject to all the legal consequences inhering in such status.

**8. Receivers ⟨⟩92—Orders reducing royalties payable to receiver, developing oil lands under existing leases, held within court's power, and not void.**

In suit involving rights of numerous claimants to oil lands in river bed being developed by receiver under existing leases, orders reducing royalties payable under certain leases *held* within the power of the court, and not void, though subject to question by parties affected.

**9. Appeal and error ⟨⟩920(5)—Appellate court held required, in view of record, to assume that orders were regularly entered, or, if ex parte, that appellant was given notice required by equity rule 4.**

In suit wherein receiver was appointed to develop oil lands under existing leases, court was required to assume, in absence of any showing to contrary in record, that orders reducing royalties payable under such leases were properly entered after notice, or, if orders were ex parte, that appellant was given notice required by equity rule 4, and failed to seasonably move to set aside.

**10. Appeal and error ⟨⟩1032(1)—Burden of producing record showing prejudice is on appellant.**

Appellant has burden of producing record which will show prejudice of her rights by orders complained of.

**11. Receivers ⟨⟩92—Order reducing royalties payable by assignee of oil lease to receiver developing property held not invalid attempt to change contract between original lessee and claimant.**

In suit involving conflicting claims of lessees of state and Indian allottees of uplands to oil lands in river beds, where particular allottee was shown to have made contract with state's lessee of lands claimed by her, providing that such lessee should proceed under state lease, and that royalties should be impounded pending determination of ownership, and where such lease was subsequently assigned by lessee, and reassigned several times, *held*, order of court reducing royalties payable under such lease to receiver (appointed to develop lands under existing leases) was not invalid, as at-

tempt to change contract between lessee and allottee; the successive assignments having been made without regard to contract made by first lessee.

**12. Appeal and error ⬤⇒71(4)—Orders reducing oil royalties payable to receiver held final and appealable, as affecting rights of claimant.**

In action involving rights of numerous claimants to oil land, where receiver was appointed to develop lands under existing leases, orders reducing royalties payable to receiver under particular leases *held* final appealable orders, as affecting rights of claimant of lands covered by such leases.

**13. Appeal and error ⬤⇒66—Generally judgment or decree must be final as to controversy to be reviewable, though exception exists where adjudication is final as affects particular parties and distinct matter.**

As general rule, a judgment or decree must be final and complete as to the controversy before it can be reviewed, though an exception exists where adjudication affects matter distinct from general subject of litigation, final in nature and particular parties only.

**14. Appeal and error ⬤⇒76(1)—Order settling substantial rights without reservation, and operative at once, is "final and appealable."**

An order is "final and appealable," if it is of character which settles substantial rights, which makes no reservation as to its effect, which is operative in a way affecting rights at once, and before or irrespective of final decree in main litigation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Final Order.]

**15. Boundaries ⬤⇒13—Boundaries of upland owner's rights in river bed are determined by producing upland boundaries directly to thread of stream, and by thread of stream between such lines.**

Boundaries of lands of river bed belonging to upland allottee are determined by producing the boundary lines of upland property directly to the thread of the stream, and by the thread of the stream between such lines so produced.

**16. Receivers ⬤⇒200—Successful claimant of oil lands held liable for costs of receivership pending suit.**

In suit involving rights of numerous claimants to oil lands in bed of river, successful claimant *held* liable for costs of receivership necessary for preservation of property pending suit.

**17. Receivers ⬤⇒200—Costs of receivership may be charged against receivership fund, even though party procuring receivership is unsuccessful.**

Whether expenses of receivership shall be paid from receivership funds is a matter within sound discretion of court, and may be so charged, even though party procuring receivership is unsuccessful in establishing title to fund.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Suit by the United States, as trustee and guardian of the Creek Nation, against the Number One Oil Company and others, in which the state of Oklahoma, Sarah Rector, and others intervened. On cross-appeal of Sarah Rector, a successful claimant, complaining of portions of decree determining extent of her recovery. Decree affirmed.

R. W. Stoutz, of Tulsa, Okl. (W. E. Disney, of Muskogee, Okl., and John Wheeler, of Tulsa, Okl., on the brief, and Anthony P. Nugent, of Kansas City, Mo., of counsel), for appellant.

H. B. Martin, Sp. Counsel for the Creek Tribe or Nation of Indians, of Tulsa, Okl., and Eustace Smith, Sp. Asst. Atty. Gen., for the United States.

W. A. Ledbetter, of Oklahoma City, Okl. (Edward H. Chandler and William O. Beall, both of Tulsa, Okl., on the brief), for appellee Mohawk Petroleum Co.

W. P. McGinnis, of Tulsa, Okl. (Y. P. Broome and J. C. Wilhoit, both of Tulsa, Okl., on the brief), for appellee Tidal Oil Co.

Before STONE, KENYON, and BOOTH, Circuit Judges.

STONE, Circuit Judge. This is the third of three appeals from the final decree (January 31, 1925) entered in one of the two so-called "river bed cases," this one, of which two cases, involved the title to the bed of the Cimarron river (a tributary of the Arkansas river) where it traversed that portion of the state of Oklahoma formerly belonging to the Creek Nation. The two other appeals and an appeal, involving the same question of title, as to the river bed lands of the Arkansas river have been disposed of in one opinion, this day filed, in No. 7119, United States v. Hayes et al., No. 7166, United States v. Cimarron River Oil Co. et al., and No. 7163, Riverside Oil & Refining Co. v. Cimarron River Oil Co. et al. (C. C. A.) 20 F.(2d) 873. The appeals in that opinion presented the single question of the title to such river bed lands. In that opinion, we affirmed the decree of the trial court adjudicating the title to be in the adjoining upland owners. This appellant is an upland owner and her appeal is not from that portion of the decree determining title to the bed lands (which is in her favor). She complains of those portions of the decree gov-

erning the extent or amount of her recovery from certain lessees who produced oil from the river bed lands adjoining her upland property. Only such facts as are material to an understanding of the present controversy will be stated here as other facts more germane to the question of title are stated in the other opinion.

A part of the Cimarron river runs through lands formerly belonging to the Creek Nation. These lands were allotted or sold under the Creek Original Agreement and the Creek Supplemental Agreement. Thereafter, oil was discovered under the river bed lands. The state of Oklahoma promptly laid claim to these river bed lands on the ground that the Cimarron river was a navigable stream. It executed leases for oil development thereof to various parties. The Creek Nation claimed these lands on the grounds that they were included in the patents to the Nation from the United States; that they were not included in the allotments or sales under the above agreements and that the Cimarron river was not a navigable stream. To protect and determine this title urged by the Creek Nation, the United States filed, as trustee and guardian of the Creek Nation, an action against these lessees. The state immediately filed an intervention therein, setting up its title and right to make the leases. Both contenders realized the imperative necessity of extracting the oil from this land to prevent drainage and loss thereof through development on the immediately adjoining uplands. The state and the United States agreed upon a plan to effectuate this preservation of the oil. This took the form of a stipulation. The above complaint, intervention and stipulation were filed on December 27, 1913.

The preamble of the stipulation is as follows:

"Whereas, the ownership and right to the possession of the lands described in complainant's bill of complaint herein, and the deposits of oil and gas underlying said lands, is the subject of controversy between complainant and said interveners, to be determined in this suit, complainant claiming title and right of possession to be in its ward, the Creek Nation of Indians, and said interveners claiming title and right of possession to be in themselves and their lessees (the defendants herein); and

"Whereas, it is believed by complainant and said interveners to be desirable that the production of oil and gas from said lands be gone forward with pending this suit and

pending the ultimate determination of the ownership and right to the possession of the said lands; and

"Whereas, to that extent it is satisfactory to complainant and said interveners for such production to proceed under the leases heretofore executed by said interveners to the defendants herein, which said leases are sought by complainant's bill to be cancelled, and copies of which are attached to said bill as Exhibits B, C, D, E and F."

The concluding two paragraphs of the stipulation are as follows:

"This stipulation is not to be taken as a recognition or concession by complainant of any title or interest of interveners in and to the said lands and the oil and gas thereunder, or as a recognition of the validity of said leases, or as a recognition or concession by said interveners of any title or interest of complainant in and to the said lands and the oil and gas thereunder, and is entered into for the sole purpose of hastening the development and conservation of the oil and gas underlying the said lands, and for the protection of whomsoever may ultimately be decreed by the court to be the owner of and entitled thereto, said development and conservation being necessary by reason of the oil and gas development and operation on the adjacent uplands; and nothing herein contained shall operate to relieve any lessee from fulfilling any agreement he may have with the Commissioners of the Land Office of the state of Oklahoma relative to the payment of the costs of litigation.

"Any person not now a party to this suit who claims an interest in any of the several tracts or parcels of land described in the bill of complaint herein may be made a party to this cause and receive the benefits of this stipulation upon subjecting himself to the jurisdiction of this court and agreeing to be bound by the provisions hereof."

From the above quotations from the stipulation, it is clear that the purpose and the sole purpose of this stipulation was to conserve the oil without prejudice to the rights of whoever might be adjudged the owner of the river bed lands and that it was thought this might be best done through the instrumentality of the leases given by the state and by impounding the royalties therefrom as representing the land owners' share from the production. The remainder of the stipulation provided a method of assuring prompt and proper production by the lessees and of insuring prompt and proper payment and impounding of the royalties from such production. This method contemplated two co-

ordinated and cooperating agencies to secure the above results. One of these was a "supervisory committee" of two members, one chosen by the United States and the other by the state. The other was a receiver to be appointed by the court. The duties of the "committee" were to supervise the proper production by the lessees; to supervise the sale of the oil constituting the royalties; to promptly report to the receiver the amounts of royalties accruing from each lease; to supervise and direct the payment of the proceeds from sale of the oil to the receiver; to demand full performance of such lessees and promptly report failure or refusal to so perform and to report fully to the court, at least as often as every 30 days. The duties of the receiver were to promptly and diligently collect and keep accurate account of all royalties, rentals and bonuses, under the leases; to safely preserve the same "subject to be disbursed only under an order of court to whomsoever may ultimately be adjudged to be the owner of said lands and entitled thereto"; to take charge of and operate any property upon default of the lessee and to report fully to the court.

The stipulation provided, also, "that all oil and gas produced from said lands under the said leases over and above the royalty, rental and bonus portion thereof shall become and be the property of said lessees and their assigns free from any claim of complainant or the said interveners." Three days later (December 30, 1913), this stipulation was presented to the court as and treated as an application "for the appointment of a receiver and for the appointment of a committee of two persons to supervise the production of oil and gas under the leases mentioned in the bill of complaint." Thereupon, the court found sufficient grounds for appointment of a receiver and made such appointment. It was made the duty of the receiver "to collect and receive promptly and diligently all rentals, royalties and bonuses due or to become due from any person, firm or corporation under the leases described in the bill of complaint herein, and safely to keep and preserve the same subject to be disbursed only under an order of this court to whomsoever may ultimately be adjudged to be the owner of the lands described in the bill of complaint herein, and entitled thereto"; to keep accurate accounts and to make monthly reports. He "is hereby ordered to take full custody and control of the several tracts or parcels of land described in said bill of complaint, subject only to the possession of the lessees or their assigns for the production of oil and gas therefrom under the said leases, and he is hereby empowered and authorized to go upon said several tracts or parcels of land at any time and make such inspections and investigations as will in his judgment enable him to perform properly his duties, power and authority under this order of appointment." The court appointed, also, a "supervisory committee" with the powers as outlined above from the stipulation. The order provided also as follows: "It is further ordered and adjudged that all oil and gas produced from any of said lands under the said leases in excess of the amount stipulated in said leases to be paid as rentals, royalties and bonuses, shall become and be the property of the lessees and the Commissioners of the Land Office of the state of Oklahoma and their assigns, free of any claim on the part of complainant or the said interveners."

Seventeen days after entry of the above order (January 16, 1914), this appellant (then a minor) filed her intervention by her guardian. After setting up her title, as owner of the shore lands, to certain adjoining portions of the river bed lands and declaring the state leases thereon to be void and a cloud upon her title, her petition proceeds as follows:

"Intervener alleges, that by and through her said guardian, T. J. Porter, and with the approval of the county court in and for Muskogee county, Oklahoma, which has jurisdiction over her said guardianship, she made and entered into a certain contract dated ———, 1913, with the Number One Oil Company, one of the defendants herein, whereby the said intervener would intervene in this action, and set up her right, title, claim and interest in and to all that part of the river bed between lots six and seven in section five, township eighteen north, range seven east, and that said Number One Oil Company, claiming under its lease from the state of Oklahoma, should have the right to take and appropriate all the oil and gas produced under its said lease with the state of Oklahoma on that part of the Cimarron river bed in excess of the royalties agreed to be paid by said Number One Oil Company to the state of Oklahoma, all of which royalties produced from said river bed intervener claims. A copy of said contract is hereto attached, marked 'Exhibit A,' and made a part hereof.

"The intervener hereby expressly consents to and agrees to be bound by the stipulation

filed herein on December 30, 1913, by and between the United States, complainant in this action, and the state of Oklahoma, and agrees that all the oil and gas produced on said premises by the Number One Oil Company known and described in said stipulation as the rental, royalty and bonus interest, may, pending the final determination of this action, be paid over to the receiver appointed by the court herein, and the oil and gas in excess of said rental, royalty and bonus interests, may be paid over to and received and appropriated by the Number One Oil Company, or its assigns.

"Premises considered, the said intervener, Sarah Rector, through her guardian, T. J. Porter, pleads, that she be permitted to interplead herein, and to assert her right, title and interest in and to the land in said river bed, and to the oil and gas rentals, royalties and bonuses provided for in said leases from the state of Oklahoma covering said lands, and that on final hearing, a judgment be rendered in favor of Sarah Rector to all of said land which lies below high-water mark between said lots six and seven in said section 5, township 18 north, range 7 east, and which lies between the meander lines on either side of said river, together with the oil and gas royalties derived and to be derived therefrom.

"That, on final hearing, a judgment also be entered in favor of Sarah Rector to said land which lies below high-water mark on the south side of said river, to the center or thread of said river, in the north half of the southeast quarter of said section six, township 18 north, range 7 east, and from the meander line of said lots nine and ten in said section six to the center of said stream, together with the oil and gas royalties derived and to be derived therefrom, and that she be adjudged to be the owner thereof, and that the complainant be decreed to have no claim or title thereto, and forever enjoin the complainant from asserting any interest whatever in said lands adverse to the intervener, and that she be awarded all other relief, both general and special, to which she may be entitled."

On March 21, 1914, appellant filed an answer to the intervention of the state wherein she denied the title of the state, alleged title in herself, denied validity of the state leases and prayed adjudication of title in her; that said state leases be declared invalid and a cloud upon her title and that "she be declared to be the owner of all the royalties and rentals and bonuses derived and to be derived from the oil and gas therefrom, and

20 F.(2d)—54

that intervener, Sarah Rector, have all other relief to which she may be entitled, both in law and in equity."

July 22, 1915, the court entered an order, in part, as follows:

"That in addition to the powers conferred and the duties imposed on the said receiver by the order of this court made and entered on the 30th day of December, 1913, the receiver shall have the power and authority, and it shall be his duty to exercise all authority, and perform all the duties heretofore imposed on and required of said supervisory committee; that pending the final determination of this suit and until otherwise ordered by the court, the development for and production and the sale of oil and gas from the premises described in complainant's bill of complaint in this action, shall be proceeded with in accordance with the terms of said leases and under the rules and regulations heretofore promulgated by the Commissioners of the Land Office of the state of Oklahoma and the supervisory committee heretofore appointed under order of the court, and under such rules and regulations as may be hereafter promulgated by said receiver; and said receiver is hereby authorized to amend or modify any rule or regulation heretofore promulgated when the same in his judgment will be advantageous in the development for and production of oil and gas from said premises and in the general conduct of said receivership; that said receiver shall determine all questions concerning the proper production of oil and gas from said lands and the proper development for the operation of oil and gas wells thereon; and shall determine the amount of rental, royalty and bonus accruing from the operation of each well, whether oil or gas, and the amount of oil and gas produced and sold, the price obtained therefor, and all other matters and things concerning the proper development for and the production and sale of oil and gas from the premises covered by each of said leases, and shall make report thereof to this court under oath, as often as once in each thirty days, said report to be made not later than the 15th day of each calendar month, and a copy of which said report shall be furnished promptly by the said receiver to the secretary of the commissioners of the Land Office of the state of Oklahoma; that said receiver shall sell all rental, royalty and bonus portions of said oil and gas produced from said premises at least once in every thirty days unless otherwise directed by proper order of this court, and all pro-

ceeds therefrom shall be held and accounted for by said receiver under the orders of said court which have been heretofore or may be hereafter made, and that should the said lessees or their assigns, or any of them, fail, neglect or refuse to proceed with the drilling of wells and the production of oil and gas under and in strict accordance with the terms of said leases and such rules and regulations, the said receiver shall demand of such lessee or his or its assigns, that he or it make good his or its default, and upon his or its failure so to do within a reasonable time, said receiver shall report such fact to this court, and after notice given and hearing had, such action shall be taken in the premises as may be provided by proper order of said court."

This order continued the "supervisory committee" as an "advisory committee" to the receiver. The order provided, also, as follows:

"It is further adjudged and decreed that said receiver shall be empowered, and it shall be his right and duty, to go upon any and all portions of the premises covered by any and all of said leases during any and all times, and make such inspections and investigations concerning the development for and the production, storage, sale or removal of said oil and gas from said premises as will in his judgment enable him to properly perform his duties fully under said receivership.

"It is further ordered and decreed that all orders heretofore made in this cause fixing and defining the power and authority and prescribing and imposing the duties of said receiver and all orders pertaining in any manner to the appointment of said receiver and the conduct of said receivership shall be and remain in full force and effect except as the same are changed and modified by this order.

"This order is made subject to such modifications in any particular thereof as the court may at any time hereafter on due notice to counsel and a hearing had, deem necessary and proper for the better conduct of the matters involved in said receivership."

There were two original state leases on different parts of the river bed claimed by appellant. One of these was to the Number One Oil Company for a term of five years from October 1, 1913, on a graduated oil production royalty with a minimum of 16⅔ per cent. on wells producing no more than 100 barrels of oil per day. This lessee seems to have been the holder of that lease at the time of appellant's intervention and it was with it that her guardians made the contract referred to in her intervention. Thereafter (upon a date not shown in the record), this lease was assigned to the Scioto Oil Company which proceeded with the development thereunder. On December 31, 1914, that company assigned the lease with the development works to Frank Brown. January 8, 1915, Brown filed an intervention setting out the history of this lease and its assignment to him and alleged that "this intervener now has and holds all of the rights, privileges, easements and interests conferred by said oil and gas lease on said Number One Oil Company, and is entitled to all the rights, interests, privileges and benefits conferred under the order of this court heretofore made appointing the receiver, together with all the rights, interests and benefits provided for and conferred by the stipulation heretofore made and entered into by and between the complainant herein, and the intervener, the state of Oklahoma, including the right to receive and appropriate to his own use and benefit all of the oil and gas produced thereon in excess of the royalty provided in said lease, to be paid to the Commissioners of the Land Office, and provided in said stipulation and order appointing the receiver to be paid to the receiver heretofore appointed in this cause." He prayed "that he be given, allowed and adjudged to have all the rights, interests, and benefits hereinbefore referred to, and that he have all other relief to which he may be entitled." January 8, 1915, the court entered an order on this intervention as follows:

"It is hereby ordered, adjudged and decreed by the court that the said Frank Brown, intervener herein, be, and he hereby is, adjudged to have all the benefits conferred on the lessees of the state of Oklahoma under the stipulation on file in this cause executed by the complainant, the United States, and the intervener, the state of Oklahoma and the Commissioners of the Land Office, and it is further adjudged and decreed by the court that the said Frank Brown shall have the right to remove and appropriate to his own use and benefit all oil and gas produced on all that portion of the bed of the Cimarron river below the highwater mark in section 5, township 18 north, range 7 east, free of any claim or demand by the complainant herein, and that said intervener, the state of Oklahoma and the Commissioners of the Land Office, and the said Frank Brown is hereby ordered and directed to conform to and comply with each and all of the provisions of the order herein appointing a receiver, and to pay to the receiver all oil and gas produced on said prem-

ises to the extent provided for in said order of the court and as stipulated in said lease executed by the Commissioners of the Land Office in the form of royalties and bonuses."

On March 1, 1915, Brown assigned the lease to the Okla Oil Company (name later changed to Tidal Oil Company). December 4, 1915, the Okla Oil Company filed its intervention in which it states that the lease held by it is jointly executed by the state and the receiver but the lease is not in the record here. Thereafter (date not appearing in record here) the lease was assigned to the Sapulpa Refining Company. December 13, 1916, the Sapulpa Refining Company filed a stipulation (joined in by the United States and the state) setting forth that the average production per well on this lease was less than 100 barrels and was decreasing while the flow of water in the wells had greatly increased and was increasing and the expense of pumping this water and other increased expenses had made operation of the lease unprofitable and that it would have to abandon the lease unless the royalty be reduced from 16⅔ per cent. to 12½ per cent. and prayed that such reduction be allowed. The court entered an order reducing the royalty to 12½ per cent. The date of this order is not shown in the record here.

The lease on the other tract claimed by appellant was executed December 6, 1913, by the state to John Henry and W. T. Barrett and was for five years from date with a flat royalty of 48½ per cent. of the oil produced. June 10, 1915, the Mohawk Petroleum Company, to which had been assigned this lease by Henry and Barrett (date not shown), made a new lease with the state and the court entered an order directing the receiver to execute same "as one of the parties lessor therein." While this new lease is not in this record it appears otherwise that the royalty therein was 25 per cent. instead of 48½ per cent. as under the former lease. October 31, 1916, the Mohawk Petroleum Company applied for a reduction of this royalty of 25 per cent. to 12½ per cent. December 13, 1916, a stipulation (joined in by the United States and the state) was filed agreeing to such reduction upon condition that the lessee drill three other wells as set forth therein. On the same day, an order was made reducing the royalty on the above condition as to drilling the wells.

Production proceeded; the stipulated royalties were paid to the receiver and he holds same subject to the orders of the court.

January 29, 1923, the state filed a stipulation that a decree might be entered against it as to title. This stipulation was caused by a decision of the Supreme Court (Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 67 L. Ed. 140), handed down on November 13, 1922, which held that the Arkansas river was not navigable above the mouth of Grand river. This stipulation, joined in by the United States, provided that "the interveners holding under leases executed by the Commissioners of the Land Office of the state of Oklahoma, or by the receivers appointed in this cause, shall, on account of their development and operation of said premises, be awarded such rights and equities as the court in its discretion may deem just. It is further stipulated and agreed that all oil and gas produced from said lands under leases from the Commissioners of the Land Office of the state of Oklahoma, or the receivers appointed in this cause, over and above the royalty, rental and bonus portions thereof, shall remain the property of such lessees or their assigns, free of any claim on the part of the plaintiff."

January 29, 1923, the cause was referred to a master to take evidence, to make findings of fact and to state conclusions of law. This order also directed the master "to take an accounting among the parties hereto, plaintiff, defendants and interveners, and to ascertain, determine and report as to what sum or sums, each of said parties may be entitled to, from and out of the moneys now impounded in the hands of the receivers heretofore appointed herein, and of any other moneys derived from oil and gas produced from said lands; and shall also ascertain and report the value of all improvements placed on the respective tracts of land operated by the different lessees or their assigns, and the cost and expenses laid out by them in developing and operating the different leases and in producing and marketing the oil and gas produced by them."

May 21, 1924, the master filed his report. This report contains a review and discussion of the questions involved; a finding of facts and a statement of conclusions of law. In so far as the issues raised by this appeal are concerned, the views of the master are summarized in the conclusions of law as follows:

"(8) The various allottees and purchasers at unallotted land sales, and their vendees, were, at the commencement of this action, the owners of all oil and gas between the meander line and the thread of the stream in front of their various lots.

"(9) None of the allottees or purchasers at unallotted land sales are parties to any of the leases executed by the Commissioners of

the Land Office of the state of Oklahoma or by the receiver and the Commissioners of the Land Office have no right to complain about the receiver and the Commissioners of the Land Office executing new leases to take the place of the leases executed by the Commissioners of the Land Office nor do they have a right to complain about the orders of the court reducing the royalties specified in the leases executed by the receiver and the Commissioners of the Land Office of the state of Oklahoma. These parties are entitled to recover damages to the extent of the difference between the value of the oil and gas and the cost of taking the same, and they are entitled to this without regard to the specifications in the leases or the orders of court reducing the royalties.

"(10) The receiver herein had the right to enter into lease contracts with the various lessees holding under the state leases by which the royalties were reduced, subject to the approval of this court.

"(11) The approval of this court of the leases entered into by the state of Oklahoma and the receiver to those who were holding under leases executed by the state of Oklahoma are valid and binding.

"(12) All orders of the court reducing the royalty and not appealed from are binding.

"(13) The leases executed by the state of Oklahoma and the receiver upon these portions of the river bed that had not formerly been leased and were not in litigation in this action, were void.

"(14) The various lessees from the state, and from the state and the receiver and their assigns were trespassers in law, but not morally.

"(15) The question as to the validity of the various leases is immaterial in determining the amount of recovery because the rule for fixing the recovery is to deduct from the value of the oil and gas extracted the cost of producing the same, and the difference would be the damages suffered.

"(16) There being no testimony offered as to the costs of production, the amount of royalty specified in the various leases at the time of the production should be taken as the difference between the value of the oil and gas and the cost of production.

"(17) The amount of recovery in this case, there being no evidence thereon further than the amount of royalty specified in the leases, is the amount of the royalty specified in the leases under which the oil and gas were extracted until such lease was changed by new lease or orders of court, and for the oil and gas taken after such change it would be the amount of the royalty fixed by such change or order.

"(18) The amount of the recovery by the lessees and their assigns under the riparian lot owners is the difference between the amount of royalty agreed to be paid by such lessees to the owners of the riparian lots and the amount of royalties collected by the receiver pursuant to the various leases, and orders of the court. Jeems Bayou Fishing & Hunting Club v. United States, 260 U. S. 561, 67 L. Ed. 402.

"(19) In calculating the amount of recovery, the amount should be the royalty on all oil and gas that were extracted under the original lease executed by the state of Oklahoma to the various lessees, calculating from the beginning to the time when such lease was changed or a new lease executed, then the amount of royalty from time to time under the new lease for the amount specified as royalty in the new lease; and where by order of court reductions were made of the royalties, the amount taken from the execution of the lease to the order of reduction should be at the rate fixed in the lease, and thereafter at the rate fixed by order of court in all cases where no appeals were taken.

"(20) The orders of court approving leases made by the state and the receivers to the various lessees, and the orders reducing the royalties were appealable orders, and all those from which no appeal was taken are final.

"(21) The bonuses paid by the various lessees upon certain portions of the Cimarron river should be distributed to the abutting lot owners in proportion to the frontage each owner has on that portion of the river covered by such lease.

"(22) Neither the lessees nor their assigns under the riparian owners are entitled to any part of the bonuses.

"(23) All costs of this cause including fees and expenses of receivers, fees for attorneys representing the receivers, the stenographer's fees for reporting the hearing before the master, and cost of securing maps and copies, and the master's fees and expenses, whatever taxes must be paid, should be paid out of the funds in the hands of the receivers in proportion to the amount to which they are entitled, except that where the riparian lot owners are exempt from taxation under the laws of the United States there should be no part of the taxes taken out of the amount that may be determined to be due them."

This appellant filed exceptions to the

report. Beside setting forth the specific portions of the report to which exception is taken, the exceptions are as follows:

"The intervener, Sarah Rector, excepts and objects to the master's report, both as to findings of facts and conclusions of law, wherein the master found that the measure of damages for the trespass on the part of the river bed lessees, is the royalty impounded in the hands of the receivers.

"This intervener further shows the court that as to the matter of the cost of production, referred to in the master's report, she understood that the master's report was to be a sectional report and that the first section thereof would deal primarily and solely with the subject of the title and ownership of the river bed, as between the riparian owners and the United States government, and this intervener contemplated that the matter of accounting between the river bed lessees and this intervener would be further taken up by the master for the subject-matter of an additional and further report; that this intervener does not have possession of any of the information, books or records to make and furnish such an account to the master, but that her river bed lessees have such information and they should be compelled to account and furnish the same, either to the court or to the master.

"Wherefore, this intervener prays the court to disapprove all those portions of the report hereinbefore specifically excepted to, and prays the court for an order directing the special master to receive further testimony and make a supplemental report upon the said matters and things hereinbefore specifically referred to, as aforesaid, and specifically as to the matter of the measure of damages to this intervener, as against her said river bed lessees."

January 31, 1925, the court entered its decree overruling all exceptions to the report of the master and adjudicating title to the river bed lands to be in the adjoining shore owners. It declares all river bed leases made by the state or the receiver or both to be inoperative from the date of the decree without prejudice to the lessees to remove all equipment from the land. Other portions of the decree, here pertinent, are as follows:

"In confirming the master's report herein, the court does not find that the river bed lessees who drilled and operated oil and gas wells in the bed of the Cimarron river are trespassers, but on the contrary finds that they are and were at all times since the appointment of the receiver herein rightfully in possession of the river bed under orders of the court."

"It is further ordered, adjudged and decreed that no writ of possession shall issue herein within thirty days from this date and not thereafter except upon application to the court upon due notice served on all adverse parties or their attorneys of record.

"Ordered, adjudged and decreed that this cause be retained for the purpose of settling and paying the costs and charges of the said receivership and apportioning to the proper parties their interests in the funds in the hands of the receiver, and for the ascertainment of the rightful claimants and owners of the residue thereof, and the apportionment and payment to them of the same, and further for the purpose of taxing all costs herein, and the making of all proper future orders, and that in the meantime and during the pendency of any and all appeals in this cause, the receiver be continued in his duties heretofore directed, subject to further orders."

It is from portions of this decree that this appeal is taken. Those portions are such as deal with the measure or amount of recovery by appellant (as an owner of the shore land) from the lessees who operated in the river bed.

As to such matter, the master determined that the lessees were "technically trespassers" or "trespassers in law, but not morally"; that the measure of recovery from them is "the difference between the value of the oil and gas and the cost of taking the same"; that the burden of establishing the amount of this difference was upon the landowner who seeks the recovery; that no evidence was introduced showing such difference; that, in the absence of such evidence, the impounded royalties, rentals and bonuses (less costs and taxes) should be the measure of recovery. The master determined, also, that the approval by the court of the leases executed by the state and/or the receiver to those holding under state leases was valid and binding; that all court orders reducing royalties, not appealed from, were binding; that the above measure of recovery (difference between value and cost of production) was applicable "without regard to the specifications in the leases or the orders of court reducing the royalties."

While the court overruled all exceptions to the above report and declared the amount of recovery (the royalties less receivership costs reserving the matters of taxes and general costs), the decree overrules the master as to the status of the lessees and the resulting

legal measure of recovery. It declares that "In confirming the master's report herein, the court does not find that the river bed lessees who drilled and operated oil and gas wells in the bed of the Cimarron river are trespassers, but on the contrary finds that they are and were at all times since the appointment of the receiver herein rightfully in possession of the river bed under orders of the court."

Appellant dissents both to the determination in the decree and to that of the master. She contends that the lessees occupy the status of "takers who act under a bona fide claim of right, but who have knowledge of the conflicting claims of others * * * and who, without first having the right decided, take a chance, and take the oil, and are held to take the consequences thereof, if their claims prove unsound," and that the proper measure of recovery is "the value of the oil immediately upon severance from the ground, which is the market value of the crude oil at the lease, without deduction for cost of producing."

The opposing position of appellees (lessees) is as follows: They claim no rights of operation through the state leases alone. They contend, first, that their operation was under the receivership and the orders of the court therein, that those orders were properly made for the conservation of the property pending the determination of ownership of the property, that such orders as are here complained of were appealable orders from which this appellant took no appeal in time and, therefore, they became final and binding upon appellant; second, that appellant stood by without objection and with full knowledge while appellees expended large sums and incurred risks in producing this oil in full reliance upon the orders of the court and are, thereby and therefore, estopped from now questioning the terms under which appellant knew the oil was being produced; third, that, if the foregoing contentions are unsound, the status of appellees is that of innocent trespassers with the resulting measure of recovery which is the difference between the value of the crude oil and the entire cost of production.

Examination of the opposing contentions of the parties suggests a logical sequence for the consideration and determination thereof. If the operation of the lessees was, as they contend, under orders of the court, binding upon appellant, in the receivership and those orders have become fixed through failure to prosecute timely appeals therefrom, obviously, that is an end to this controversy. If such orders are binding but were not appealable except by appeal from the above decree of the court, obviously, they are open for such examination and action as this record permits. If the operation was not under the orders of the court in the receivership, but the record establishes the facts from which an estoppel must result, then, obviously, the recovery must be measured by the royalties alone. If the operation was not under the orders of the court in the receivership and there is no estoppel, appellees were, obviously, trespassers of some degree and the measure of recovery is that resulting legally from such status. Our consideration will, therefore, be of the foregoing propositions in the order just stated.

There is no dispute as to the right of the United States to bring this action for the protection of land claimed by the Creek Nation. There is no attack upon the jurisdiction of the court to entertain such action against lessees of the state who were claiming the right to operate upon this land and to take therefrom its principal value, basing such right upon ownership of the land by the state. There is no question of the right of the state to intervene to establish its title and to protect its lessees. As and when filed, the suit was an equitable action involving the question of title to these river bed lands.

[1] Had no one been then active or threatening to make use of or to take value from such lands, no receivership could have been justified and the action could and would have proceeded to conclusion without such. But that was not the situation. Practically the entire value of these lands lay in the oil beneath them. Oil production development was proceeding or threatened on the adjoining uplands. The result of such development would necessarily be drainage of oil from the river bed deposits. The only way in which that loss could be prevented and those deposits secured for whoever might be the owner of the river bed lands was to sink wells therein and procure the oil before it could be drained therefrom. An urgent necessity existed for the conservation of the oil pending the litigation over the title thereto. Such a situation justified, if indeed it did not require, a receivership. Such was sought by the then contending claimants of the title and the court very properly appointed a receiver. The broad purpose of the receivership was to secure and protect development of the river bed oil deposits so that the fruits thereof might be secured and held for whomsoever might be adjudicated the owner thereof.

Clothed with full power, as a court of

equity, to conserve this property for this purpose, and faced with the clear necessity of proceeding speedily with development of the property, the court had large choice of the method and means of doing so. For example, it could have clothed its receiver with power to and have ordered him to prosecute such development himself. Oklahoma v. Texas, 252 U. S. 373, 374, 40 S. Ct. 353, 64 L. Ed. 619; Id., 253 U. S. 465 and 469, 40 S. Ct. 580, 64 L. Ed. 1015, 1017; Id., 256 U. S. 602, 41 S. Ct. 539, 65 L. Ed. 1114. It could have conditioned such development upon advance of the expenses by the existing lessee (Oklahoma v. Texas, 256 U. S. 603, 41 S. Ct. 539, 65 L. Ed. 1114), or by the disputing claimants (Elk Fork O. & G. Co. v. Foster, 99 F. 495 [C. C. A. 4th]). It could have ordered him to make contracts for development on a royalty basis (Oklahoma v. Texas, 253 U. S. 465, 466, 40 S. Ct. 580, 64 L. Ed. 1015, 1017; Swift v. Black Panther O. & G. Co., 244 F. 20, this court), or to employ others to operate for him and at his expense (Oklahoma v. Texas, 253 U. S. 465, 467, 40 S. Ct. 580, 64 L. Ed. 1015, 1017, also see 254 U. S. 280, 41 S. Ct. 146, 65 L. Ed. 270; and Id., 254 U. S. 604, 41 S. Ct. 317, 65 L. Ed. 434). It could have ordered him to proceed under contracts already made. The choice was a matter of discretion, naturally based upon the actual conditions facing the court and in which it found the property.

[2] Here those conditions were as follows: There were two contenders for the title, one of which had entered into formal leases for development of the disputed property; those leases were carefully drawn to protect the property owner; they provided for liberal royalties; the receiver had no funds for development; both of the then parties claimant were asking the court to permit the development to proceed under these leases; to prevent development thereunder might involve the lessees in losses or the lessor state to claims; a plan for so proceeding which would insure prompt and diligent production and safe impounding of the royalties was presented to the court by the then claimants of title. The court chose to use these existing means for development. The existing conditions justified this exercise of discretion.

[3] Appellant contends that the court had no power to take this oil through the medium of an invalid lease and relies strongly upon the case of Sperry Oil & Gas Co. v. Chisholm, 264 U. S. 488, 44 S. Ct. 372, 68 L. Ed. 803. The Sperry Case is not appli-

cable because the situation there is, in a legal sense, not at all that here present. There the question was the right of a lessee to continue operation under a lease held invalid. Here the question is the power of a federal court of equity, in a receivership, to employ an existing lease (the validity of which was in dispute) as a means of conserving the property, for whomever was entitled thereto, with full consent of all title claimants then before the court. This position is not tenable for another reason. Appellant formally and expressly consented to this action of the court in her intervention.

[4] Another contention of appellant is that the receivership was merely for the purpose of impounding and administering the royalties and did not extend to the leases which were, in a legal sense, left unaffected. The receivership was more extensive than appellant contends. The order appointing the receiver contains the following: "Is hereby ordered to take full custody and control of the several tracts or parcels of land described in said bill of complaint, subject only to the possession of the lessees or their assigns, for the production of oil and gas therefrom under the said leases, and he is hereby empowered and authorized to go upon said several tracts or parcels of land at any time and make such inspections and investigations as will in his judgment enable him to perform properly his duties, power and authority under this order of appointment."

Another provision was that "pending the final determination of this suit, the production of oil and gas from said lands shall be proceeded with under the said leases, and that such production shall be in strict accordance with the terms of said leases and the rules and regulations heretofore promulgated by the Commissioners of the Land Office of the state of Oklahoma and shall be under the immediate supervision and control of a supervisory committee of two persons." A further provision is that "it is further ordered and adjudged that all oil and gas produced from any of said lands under the said leases in excess of the amount stipulated in said leases to be paid as rentals, royalties and bonuses, shall become and be the property of the lessees of the Commissioners of the Land Office of the state of Oklahoma and their assigns, free of any claim on the part of complainant or the said interveners." Another provision is that "it is further ordered, adjudged and decreed that should the said lessees or their assigns, or any of them, fail, neglect or refuse to proceed with the drill-

ing of wells and the production of oil and gas under and in strict accordance with the terms of said leases and said rules and regulations, the said supervisory committee shall demand of such lessees or his or its assigns that he or it make good his or its default, and on his or its failure so to do, within a reasonable time, said supervisory committee shall report such fact to this court, and that should any lessee or his assign wilfully or fraudulently conceal or attempt to conceal any of the production of oil or gas from said leased premises, or wilfully or fraudulently fail, neglect or refuse to give to said supervisory committee or to the receiver appointed hereunder or to this court when demanded, a correct account of the oil and gas produced from his or its leased premises for any designated period, and promptly to pay the royalties thereon, then the said supervisory committee or the said receiver shall forthwith report that fact to this court."

The quoted provisions reveal that the court, through its receiver, took full control of the property subject to the leases, adopted those leases as the means of developing the lands, provided for complete supervision, under its control, of the operation thereunder, impounded the royalties, projected the authority of the court into the leases themselves by assuring to the lessees their rights thereunder, and provided for action by the court in case the lessees defaulted. This was as potent, in practical results and legal effect, as a formal adoption of the leases as the contracts of the receiver could have been. Under this order, the property was taken over by the court and its operation was under control of and by the orders of the court with all of the resulting rights, liabilities and protection which such control and orders carried. Aside from this, when appellant intervened this situation existed and she expressly consented to its continuance and cannot be heard to complain to the contrary.

We come next to consideration of the orders of the court reducing the royalties. There were three of these orders. Two of them related to the lease originally made to Henry and Barrett, which were assigned to the Mohawk Petroleum Company. The other, to the lease originally made to the Number One Oil Company which passed by successive assignments to the Sapulpa Refining Company.

The original lease to Henry and Barrett provided a flat royalty of 48½ per cent. for oil and was in existence when this action was filed, on December 27, 1913. The record here is silent as to any development by Henry and Barrett or as to the date of the assignment of the lease by them to the Mohawk Petroleum Company. On June 10, 1915, counsel for the United States, for the state and for the Mohawk Petroleum Company presented a new lease covering the same land as the earlier lease to Henry and Barrett. It was stated that the company was the assignee of the old lease and that it had entered into a contract for a new lease with the United States and the state and asked to have this new lease approved by the court and that the receiver be ordered to join in the execution as a lessor. The court ordered approval and that the receiver so join. This new lease does not appear in the record but from other parts of the record it is clear that one provision thereof was a royalty of 25 per cent.—a reduction from the former lease royalty of 48½ per cent. Thereafter, on October 31, 1916, the Mohawk Petroleum Company applied for a reduction of the royalty from 25 per cent. to 12½ per cent., stating "that, after most diligent effort and the exercise of the most rigid economy, it is now apparent that said lease cannot be fully operated and developed without great loss to this applicant, unless the royalty exacted of this applicant be reduced to 12½ per cent. of the oil produced therefrom, and 12½ per cent. royalty will be a reasonable and equitable royalty to be paid said receiver. That 12½ per cent. is the usual and customary royalty charged by owners of property to lessees in the vicinity of said premises." This application prayed that "an investigation be made in such manner as may be directed by the court and that on final hearing hereof, the said royalty be reduced to 12½ per cent. of the gross amount of oil produced on said premises." On December 13, 1916, a stipulation (joined in by the United States, the state, and the Mohawk Petroleum Company) was filed. This stipulation stated as follows:

"Whereas, it appears that at the time of the execution of the said lease contract and the making of the said orders aforesaid, the oil and gas bearing sands underlying the above described portion of the Cimarron River bed were very rich in their deposit of oil and gas, and the wells drilled on said premises were very prolific producers, averaging as high as several hundred barrels of oil each per day, with no showing of water; and

"Whereas, it now appears from the reports of the said receiver and evidence fur-

nished by the said lessee that the daily average production of oil from the 13 wells now in operation on the said lease for the nine months ending September 30, 1916, was only 558.86 barrels, and that the daily average production of said lease for the month of October, 1916, was 538.98 barrels; that the decline in monthly production of oil from said land is approximately in the ratio above shown; that one-third of the wells on this property are now making water and the volume of water is rapidly increasing as the production of oil declines; that four of the said wells are now making less than 15 barrels each per day; that the handling of this large volume of water greatly increases the cost of producing oil, as it not only necessitates the installing of larger tubing and rods, but the acid in the water crystallizes the iron in the tubing and rods and so increases the breakage, and makes it necessary to install new tubing and new rods after about each two months' service; and in addition to the expense of such new material, the expense of labor is greatly increased; that in addition to the above expenses, the expense incident to the operation of river bed properties greatly exceeds that of operating upland properties due to frequent destruction of rigs erected on the river bed by fire and water; to increased cost of getting material to the river bed wells and the great cost of building revertments and other break waters to keep the river at high stages from carrying away all the improvements put upon the river bed lease; and

"Whereas, it further appears that owing to the above and many other conditions now existing which make the operation of river bed property hazardous and expensive, and unless a reduction of royalty is granted, the said lessee cannot continue the operation of said property, and the property will be abandoned as exhausted of oil and gas in paying quantities, and believing that best interest of complainant and of the Creek Nation, and of the state of Oklahoma, and of all persons claiming an interest in, or title to, the above described premises will be best conserved by a reduction of royalty to the end that the operation of the property may be continued and said property be kept a producing property for the longest time possible."

Because of the foregoing the court was requested, therein, to reduce the royalty to 12½ per cent. "on the condition that the said Mohawk Petroleum Company shall forthwith drill to the Bartlesville sand one additional well on the premises herein described; provided further that in the event said first well so drilled as above provided for shall produce 15 barrels of oil per day or more, then the said Mohawk Petroleum Company shall drill an additional well to the same depth on said premises, and if the said second additional well shall likewise produce 15 barrels of oil per day or more, then the said Mohawk Petroleum Company shall drill a third well to a like depth on said premises, the location of the said three additional wells to be agreed upon by the said lessee and the said receiver; and should the said Mohawk Petroleum Company fail or refuse either to promptly begin the drilling of said additional wells on the conditions herein provided for, or to diligently continue the drilling of said wells until completed, then this agreement shall be null and void and the royalty of 25 per cent. of the gross production of the oil and gas extracted from said premises shall be paid by said lessee as now provided for by the lease contract, and the orders of this court heretofore made: Provided further that in no event shall the reduction of royalty to 12½ per cent. of the gross production become effective until the first well, the drilling of which is herein provided for, shall be completed." The same day the court entered an order reducing the royalty on the conditions stated in the stipulation.

The reduction of royalty as to the other tract came about as follows: The original lease to the Number One Oil Company provided for a graduated royalty based on the daily average well production in 30-day periods, the minimum being 16⅔ per cent. "on all wells producing less than 100 barrels per day of twenty-four hours." December 13, 1916, a stipulation (joined in by the United States, the state and the Sapulpa Refining Company, which had succeeded to the lease through mesne assignments) was filed. The stipulation stated:

"Whereas, it appears that under the terms and conditions of said lease and the orders of said court pertaining thereto as aforesaid, the said Sapulpa Refining Company is now required to pay into the hands of the receiver in said cause as royalty 16⅔ of the gross production of all oil and gas extracted from said lands, which said royalty is to be held by the said receiver for the use and benefit of the party ultimately adjudged to be the owner of said premises; and

"Whereas, it appears that at the time of the execution of the said lease contract and the making of the said orders aforesaid, the

oil and gas bearing sands underlying the above described portion of the Cimarron river bed were very rich in their deposits of oil and gas, and the wells drilled on said premises were very prolific producers, averaging from several hundred barrels to five and six thousand barrels each per day, with no showing of water; and

"Whereas, it now appears from the reports of the said receiver and evidence furnished by the said lessee that the daily average production of oil from the nine wells now in operation on the said lease for the nine months ending September 30, 1916, was only 87.39 barrels, and that the daily average production of said lease for the month of October, 1916, was 76.03 barrels; that the decline in monthly production of oil from said land is approximately in the ratio above shown; that all the wells on this property are now making water and the volume of water is rapidly increasing as the production of oil declines; that during the month of October, 1916, for each 80 to 85 barrels of oil produced, it was necessary to pump from said wells from 800 to 900 barrels of water; that the handling of this large volume of water greatly increases the cost of producing oil, as it not only necessitates the installing of larger tubing and rods, but the acid in the water crystallizes the iron in the tubing and rods and so increases the breakage, and makes it necessary to install new tubing and new rods after about each two months' service; and in addition to the expense of such new material, the expense of labor is greatly increased; that in addition to the above extra expenses, the expense incident to the operation of river bed properties greatly exceeds that of operating upland properties due to frequent destruction of rigs erected on the river bed by fire and water; to increased cost of getting material to the river bed wells and the great cost of building revertments and other break waters to keep the river at high stages from carrying away all the improvements put upon the river bed lease; and

"Whereas it further appears that owing to the above and many other conditions now existing which make the operation of river bed property hazardous and expensive, and that for the past several months it has cost the said lessee of the above described premises from 70 cents to $1.25 per barrel to produce oil therefrom, and unless a reduction of royalty is granted, the said lessee cannot continue the operation of said property, and the property will be abandoned as exhausted

of oil and gas in paying quantities, and believing the best interests of complainant and of the Creek Nation and of the state of Oklahoma and of all persons claiming an interest in or title to the above described premises will be best conserved by a reduction of royalty to the end that the operation of the property may be continued and said property be kept a producing property for the longest time possible."

The stipulation requested reduction of the royalty from 16⅔ per cent., the rate due under the lease and the then production, to 12½ per cent. This reduction was ordered on a date not shown in the record here.

The reasons urged by appellant why these orders reducing royalties are claimed to be not binding on her are summarized by counsel as follows:

"A. The allottees were not parties to the leases or to the orders reducing royalties.

"B. The orders were not final, appealable decrees.

"C. Because there was no power in the court to take oil from undeveloped lands, against the will of the owner, even to prevent waste.

"D. There is no estoppel against the allottee by the fact of intervention; intervention is not an attack on the jurisdiction of the court.

"E. There is no estoppel against the allottee, or impropriety, in claiming a part of the royalty impounded in court.

"F. The court was without power to change contracts made between lessee and allottee.

"G. The court had no power in ex parte administrative orders to bind property rights of the allottee without her knowledge or consent."

[5] In our consideration of these reasons we will first dispose of A, C, D, E and G together. At the time of her intervention, appellant expressly accepted and approved of the situation of the litigation as it then stood. That approval included the jurisdiction of the court; the appointment of the receiver and the method of development (through the existing leases) then in force through orders of the court theretofore made. Whether she might have objected to this method, in part or whole, is immaterial because she expressly assented thereto. What we have said above as to estoppel in connection with the original leases has no application to the orders reducing royalties, all of which were entered after appellant became a party to this action through her intervention.

What has been said above disposes of A and C and only a few observations need be added thereto. It is immaterial that appellant was not a party to the leases because these leases became, in essence and effect, the leases of the receiver and this was true as to some of them in the hands of assignees even to the extent that the lease was formally executed by the receiver as a party lessor. The court did not merely impound the royalties and leave the parties to the leases and their rights and liabilities as they were before the receiver was appointed. The land was taken into the custody of the court and the court's officers and appointees supervised the operation, even under the original leases before the receiver became a formal party thereto. All of the parties to the leases submitted to the jurisdiction of the court, acted under and obeyed its orders and are entitled to any protection flowing from those orders.

[6] The right to take the oil from the lands is beyond question. It was the typical situation of rival claimants to property with a drastic need for immediately taking the oil as the only method of preserving it pending the controversy over ownership of it. The fact that appellant had an unestablished claim to the oil had no bearing upon the right of the court to conserve it for her or whomever might ultimately be determined the owner of it. Also, although her consent was not necessary, she did formally consent to the receivership and to development through the leases. By that intervention, however, she gave no consent to orders yet to be made in the future progress of the action and of the receivership. Her only consent, by her intervention, was to the status of the case as it stood when she intervened.

[7] By that intervention she became a party to the action clothed with all the rights, burdened with all the duties and subject to all the legal consequences inhering in such status. French v. Gapen, 105 U. S. 509, 525, 26 L. Ed. 951; Swift v. Black Panther Oil & Gas Co., 244 F. 20, 29, this court; Hamlin v. R. R. Co., 78 F. 664, 666, 36 L. R. A. 826 (C. C. A. 6th), Circuit Judges Taft and Lurton sitting, the opinion by Judge Lurton. One of the legal consequences was that she (as all other parties to the action) would be bound by all orders properly made thereafter in the litigation. One of the legal rights was to object and to be heard upon all matters affecting her rights and, at some time, to have reviewed on appeal any order she deemed to her prejudice. The court had jurisdiction to produce this oil in order to conserve it pending the litigation; it had power, as a means for such production, to operate through the lessee; it had power to alter those contracts (where the contract permitted or the lessee consented) in any respect it thought necessary or advisable to secure the best production; therefore, these three orders of reduction of royalties were within the power of the court.

[8] Being within the power of the court, they were not void but they were subject to question by any party to the suit affected thereby. These orders did directly and seriously affect the rights of this appellant because they reduced the fund conserved for her benefit if she established her claim to title. They were of a character to be binding upon her and were binding unless some particular reason can be shown why they were not.

[9] Appellant contends these orders were not binding because they were made ex parte without notice or her knowledge. This contention is met by the state of the record here which does not show what took place. It was within the power of appellant to make this record unmistakable on this matter. As the record is here, there is no showing one way or the other. Therefore, we must presume that the court proceeded regularly (City and County of Denver v. Stenger, 295 F. 809, 814, this court) and that any notice required by equity practice was given or that, if the order was ex parte, appellant was given the notice required by equity rule IV and that appellant failed seasonably to move to reconsider, set aside or modify such orders.

[10] The burden is upon appellant to produce a record here which will show prejudice of her rights in the trial court (Bankers' Trust Co. v. M., K. & T. Ry. Co., 251 F. 789, 798, this court) and she has failed in that respect as to this contention. Our conclusion is that these orders were within the jurisdiction of the court; that we must, at least under this record, hold them to have been properly made; and that they are binding upon all parties affected thereby (including appellant), subject to any right of appeal appellant may have.

[11] Appellant's reason F, that "the court was without power to change contracts made between lessee and allottee," applies only to the tract covered by the lease to the Number One Oil Company. Shortly before this action was filed, appellant made a contract with that company covering the same river bed land as that covered by the lease be-

tween the state and that company. That contract sets forth her claim to the land, expressly recognizes that the state and · the United States (for the Creek Nation) claim ownership and the former has made a lease therefor to the company, sets forth the royalties provided in the state lease, provides for the immediate institution of an action to determine the title of appellant, provides that the company shall proceed under the state lease and that the royalties stipulated in that lease shall be impounded in the court pending final determination of ownership and, if she is adjudged owner, such impounded royalties to go to her, and provides that, if she be adjudged owner, the company or its assigns may continue production on payment to her of the royalties provided in the lease as long as oil and gas may be produced in paying quantities. So long as the court operated the property through the Number One Oil Company at the royalties provided in the original lease, there was no injury to appellant for she was securing precisely what her contract called for. She could suffer no injury until those royalties were reduced and whether she did then would depend upon the evidence and upon the construction of the contract as to the legal duty of the lessee to ' continue production under the circumstances which might be shown to exist at the time the reduction occurred. But this reduction occurred long after the Number One Oil Company had assigned its lease from the state.

There had been various successive assignments before the state lease came to the Sapulpa Refining Company, which first secured the reduction of royalties, not earlier than December 13, 1916. The record does not show and appellant does not claim that the Sapulpa or any of the mesne assignees of the state lease became assignees of the contract between appellant and the Number One Oil Company or ever 'recognized that contract, asserted any rights thereunder or consented to be bound thereby. There was no legal connection between the state lease and the contract, except as to appellant and the Number One Oil Company. The rights and liabilities under the two instruments were (except as to appellant and the Number One Oil Company) distinct and entirely separate. The court made no order based upon the contract. The instrumentality employed by the court to develop the property was the lease. It did this before appellant intervened and brought her contract to the notice of the court and the court thereafter based no action upon the contract. So far as this record reveals, the Sapulpa Refining Company was proceeding entirely under the orders of the court in relation to the lease and had no contractual relation with appellant, no legal connection with her contract and was in no way bound thereby. What rights, if any, appellant may have against the Number One Oil Company, we do not consider since the question here (entirely different) is whether the reduction of royalties given to the Sapulpa Refining Company, which was operating the state lease under the orders of the court in the receivership, was within the power of the court because it changed this contract.

[12] We next consider the remaining reason (B) that the orders reducing royalties were not final, appealable orders. Before considering the reduction orders, we will dispose of a similar contention concerning the original order appointing the receiver and adopting the state leases as means of production. Even if appellant could, in this appeal, challenge that original order (which we do not determine), it would be of no avail because she expressly assented thereto upon her entrance into the action through her intervention. She did not so assent to the orders of reduction made after her intervention. That she would have the right to a review of those later orders on appeal is evident. The question is whether those orders were final in the sense and meaning of the statute governing appeals so that her right to appeal arose when they were entered or whether they lacked such finality and, therefore, her right of appeal must wait and abide the final decree adjudicating the main controversy.

[13] The decree which disposed of the main controversy—the title to the river bed lands —was entered January 31, 1925, and is the decree from which this appeal was taken. The reduction orders were entered late in 1916 and production has proceeded under them since that time. The general rule is that a judgment or decree must be final and complete as to the controversy before it can be reviewed, but there are exceptions to or modifications of this rule. As to the question before us, the rule and the only suggested exceptions applicable here are clearly stated in the recent case of United States v. River Rouge Improvement Co., 269 U. S. 411, at page 414, 46 S. Ct. 144, 145 (70 L. Ed. 339), as follows:

"While the general rule requires that a judgment of a federal court shall be final and complete before it may be reviewed on

a writ of error or appeal, it is well settled that an adjudication final in its nature as to a matter distinct from the general subject of the litigation and affecting only the parties to the particular controversy, may be reviewed without awaiting the determination of the general litigation. Williams v. Morgan, 111 U. S. 684, 699, 4 S. Ct. 638, 28 L. Ed. 559; Collins v. Miller, 252 U. S. 364, 371, 40 S. Ct. 347, 64 L. Ed. 616; Arnold v. Guimarin, 263 U. S. 427, 434, 44 S. Ct. 144, 68 L. Ed. 371."

The question here is whether these reduction orders were matters "distinct from the general litigation and affecting only the parties to the particular controversy" and "final in its nature." It will be helpful to know something of what the Supreme Court and the Circuit Courts of Appeals have held to be such "distinct controversies" and what orders therein are regarded as final. In Collins v. Miller, 252 U. S. 364, 370, 40 S. Ct. 347, 349 (64 L. Ed. 616) the court said:

"And the rule requires that the judgment to be appealable should be final not only as to all the parties, but as to the whole subject-matter and as to all the causes of action involved. Louisiana Navigation Co. v. Oyster Commission, 226 U. S. 99, 101 [33 S. Ct. 78, 57 L. Ed. 138], Sheppy v. Stevens [C. C. A.] 200 F. 946. The seeming exception to this rule by which an adjudication final in its nature of matters distinct from the general subject of the litigation, like a claim to property presented by intervening petition in a receivership proceeding, has been treated as final so as to authorize an appeal without awaiting the termination of the general litigation below (Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 224 [10 S. Ct. 736, 34 L. Ed. 97]; Williams v. Morgan, 111 U. S. 684, 699 [4 S. Ct. 638, 28 L. Ed. 559]; Trustees v. Greenough, 105 U. S. 527 [26 L. Ed. 1157]) has no application here. Nor have cases like Forgay v. Conrad, 6 How. 201, 204 [12 L. Ed. 404] and Thomson v. Dean, 7 Wall. 342, 345 [19 L. Ed. 94], where decrees finally disposing of property which the successful party was entitled to have carried into execution immediately, were held appealable, although certain accounts pursuant to the decree remained to be settled."

In Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 10 S. Ct. 736, 34 L. Ed. 97, the court made two orders directing its receiver of certain steam railroads to retain and pay for several locomotives necessary to the operation of the property by the receiver. The order provided that such payment should be regarded as operating expenses and entitled to payment prior to mortgages existing before the receivership. These orders were made without notice under the erroneous impression of the court that all parties consented thereto. After the term at which the orders were made, the court entered an order setting the above orders aside. Several terms later and after sale of the entire property under foreclosure of the mortgages, the court determined that it lacked jurisdiction to enter the order annulling the two purchase orders, because the term within which those orders were entered had expired. Therefore, it entered a fourth order annulling the order setting aside the two purchase orders. The question arose whether the two purchase orders were final in an appealable sense. The court (page 224 [10 S. Ct. 742]) said:

"We think they were final. They determined the ownership of the locomotives, and the right to their possession; that they were essential to the operation of the roads by the receiver, and should be purchased by him; that certain designated amounts should be paid for the rentals and the purchase price, which amounts were made a charge upon the earnings, income, and property of the Toledo, Cincinnati & St. Louis Railroad Company, and especially of the particular divisions named; and that the amounts should be paid by the receiver, and any balance remaining unpaid at the date of the foreclosure and sale of the railroad or the particular division should be a first lien thereon, and the sale be made subject thereto. They were therefore final in their nature, and made upon matters distinct from the general subject of litigation, the foreclosure of the mortgages.

"In Trustees v. Greenough, 105 U. S. 527 [26 L. Ed. 1157] an appeal from an order for the allowance of costs and expenses to a complainant, suing on behalf of a trust fund, was sustained. In Hinckley v. Gilman, Clinton & Springfield Railroad Co., 94 U. S. 467 [24 L. Ed. 166] a receiver was allowed to appeal from a decree against him to pay a sum of money in the cause in which he was appointed. In Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638 [28 L. Ed. 559], a decree in a foreclosure suit, fixing the compensation to be paid to the trustees under a mortgage from the fund realized from the sale, was held to be a final decree as to that matter; and in Fosdick v. Schall, 99 U. S. 235 [25 L. Ed. 339] a decree upon an inter-

vening petition in respect to certain cars used by a railroad company under a contract with the manufacturer was so treated. There was a fund in court in that case, but in principle the orders here are the same. And see Farmers' Loan & Trust Co., Petitioner, 129 U. S. 206, 213, 9 S. Ct. 265 [32 L. Ed. 656]."

In Denny v. Bennett, 128 U. S. 503, 9 S. Ct. 134, 32 L. Ed. 491, an order denying intervention where intervention was a matter of right. In the Farmers' Loan & Trust Co., 129 U. S. 206, 9 S. Ct. 265, 32 L. Ed. 656, an order authorizing issue of receiver's certificates to constitute lien prior to mortgages. The court (page 213 [9 S. Ct. 266]) says:

"The first and most important of these is, that the order from which the appeal is asked is not a final decree, within the meaning of the act of Congress on that subject, but is a mere ancillary proceeding for the protection of the property pending an appeal from the principal decree now before this court. But the doctrine that, after a decree which disposes of a principal subject of litigation and settles the rights of the parties in regard to that matter, there may subsequently arise important matters requiring the judicial action of the court in relation to the same property and some of the same rights litigated in the main suit, making necessary substantive and important orders and decrees, in which the most material rights of the parties may be passed upon by the court, and which, when they partake of the nature of final decisions of those rights, may be appealed from, is well established by the decisions of this court. Blossom v. Milwaukee, etc., Railroad Co., 1 Wall. 655 [17 L. Ed. 673]; Forgay v. Conrad, 6 How. 201 [12 L. Ed. 404]; Fosdick v. Schall, 99 U. S. 235 [25 L. Ed. 339]; Williams v. Morgan, 111 U. S. 684 [4 S. Ct. 638, 28 L. Ed. 559]; Burnham v. Bowen, 111 U. S. 776 [4 S. Ct. 675, 28 L. Ed. 596].

"The question in such cases is not whether the order complained of is of a character decisive of questions that the parties are entitled to have reviewed in the appellate court, but whether the order or decree is of that final nature which alone can be brought to this court on appeal. It is upon this ground mainly that the right of appeal is resisted in the present case; but we are of opinion that, within the true principles which establish the finality of a decree of the Circuit Court in reference to the allowance of an appeal, this order is a final decree.

"If the order is executed, the first thing to be done under it will be to borrow money to the extent authorized therein, and then the receivers will issue the certificates contemplated in it. It is not necessary to hold here what the position of the holders of such certificates would be, if the order contained no provision that they should be the first lien upon the property of the company. It might be, but it is not necessary to decide that question here, that such an order would not be conclusive of the right of the holders of such certificates to priority of payment out of the proceeds of the sale of the railway. It is one of the arguments used before us, that upon a final sale, and an order by the court for the distribution of its proceeds, such certificates would not necessarily be held to have such priority; but that, issued under this order, and containing on their face the provision authorized by it, they would constitute a first lien upon the property of the railway company to be sold under the final decree, is, we think, very clear. Such order standing unrepealed, we do not think that the court in a subsequent stage of the same litigation, in the same case and in regard to the same subject matter, could be permitted to say that the holders of these certificates must establish their right to priority of payment; but we are of opinion that such holders, under the decree of this court that they should have priority standing unreversed, would be entitled to such first lien.

"These views we do not propose to elaborate, further than to say that if this order does not give the lender of the money such prior lien upon the proceeds of the property of the company it is because the court had no authority to make it, and as it would be a fraud upon such lender justice could only be done by enforcing it. If this view of the subject be correct, of which we entertain no doubt, the order is a final one. It is a decree fixing upon the property, on which the trust company now has a first lien, another lien of $120,000, and making it paramount to that. It changes the relation of that company to this property, displaces its rights as settled by a decree now pending in this court, and if that decree is affirmed, it in effect modifies it, although this court may say that it should stand and be enforced. This order comes within all the elements of finality which we can imagine to belong to a decree of the Circuit Court. It establishes certain rights of the parties, to the injury, as petitioners believe, of their interests in the property.

"We need not refer to cases on the subject of finality, for they are numerous, and the principles on which they have been decided apply to widely varying circumstances. But while we are not aware of any case precisely in point to the one before us, we are satisfied that it is within the purpose of the statute and the principles by which it is to be construed."

In Gumbel v. Pitkin, 113 U. S. 545, 5 S. Ct. 616, 28 L. Ed. 1128, an order dismissing an intervention, claiming property in custody of marshal, and distributing proceeds thereof to others.

In Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638, 28 L. Ed. 559, a decree in a foreclosure suit, fixing the compensation to be paid to the trustees under a mortgage from a fund realized from the sale, was held to be final as to that matter and appealable; the court (page 699 [4 S. Ct. 646]) saying:

"That the order was such as could be appealed from, we think, is equally apparent. It was final in its nature, and was made in a matter distinct from the general subject of litigation—a matter by itself, which affected only the parties to the particular controversy, and those whom they represented."

In Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, were involved orders making allowances, from funds in the hands of a receiver, to complainant for expenditures made by him in connection with securing the fund. The court (page 531) said:

"The first question, however, is whether these orders do or do not amount to a final decree, upon which an appeal lies to this court. They are certainly a final determination of the particular matter arising upon the complainant's petition for allowances, and direct the payment of money out of the fund in the hands of the receiver. Though incidental to the cause, the inquiry was a collateral one, having a distinct and independent character, and received a final decision. The administration of the fund for the benefit of the bondholders may continue in the court for a long time to come, dividends being made from time to time in payment of coupons still unsatisfied. The case is a peculiar one, it is true; but under all the circumstances, we think that the proceeding may be regarded as so far independent as to make the decision substantially a final decree for the purposes of an appeal."

In Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, a decree upon an intervening petition ordering return of certain cars used by the receiver was held final and appealable.

In Sage v. Railroad Co., 96 U. S. 712, 24 L. Ed. 641, the court held an order confirming sale which cut off the equity of redemption by the company, junior mortgagees and general creditors and passed title to the purchaser was final and appealable, citing (page 714) Butterfield v. Usher, 91 U. S. 246, 23 L. Ed. 318, and Blossom v. Railroad Co., 1 Wall. 655, 17 L. Ed. 673.

In Hinckley v. Railroad Co., 94 U. S. 467, 24 L. Ed. 166, a decree against a receiver, upon settlement of his accounts, held final and appealable by him. The court (page 469) says:

"The receiver cannot and does not attempt to appeal from the decree of foreclosure, or from any order or decree of the court, except such as relates to the settlement of his accounts. To that extent he has been subjected to the jurisdiction of the court and made liable to its orders and decrees. He has, therefore, the corresponding right to contend against all claims made against him. For this purpose he occupies the position of a party to the suit, although an officer of the court, and after the final decree below has the right to his appeal here. In this case, the final decree has been given, and the case is properly here upon the appeal as prayed and allowed."

In Forgay v. Conrad, 6 How. 201, 12 L. Ed. 404, an order declaring deeds void and ordering delivery of the property. The court (pages 203, 204) says:

"The question upon the motion to dismiss is whether this is a final decree, within the meaning of the acts of Congress. Undoubtedly, it is not final, in the strict, technical sense of that term. But this court has not heretofore understood the words 'final decrees' in this strict and technical sense, but has given to them a more liberal, and, as we think, a more reasonable construction, and one more consonant to the intention of the Legislature."

"And when the decree decides the right to the property in contest, and directs it to be delivered up by the defendant to the complainant, or directs it to be sold, or directs the defendant to pay a certain sum of money to the complainant, and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one to that extent, and authorizes an appeal to this court, although so much of the bill is retained in the Circuit Court as is necessary for the purpose of

adjusting by a further decree the accounts between the parties pursuant to the decree passed.

"This rule, of course, does not extend to cases where money is directed to be paid into court, or property to be delivered to a receiver, or property held in trust to be delivered to a new trustee appointed by the court, or to cases of a like description. Orders of that kind are frequently and necessarily made in the progress of a cause. But they are interlocutory only, and intended to preserve the subject-matter in dispute from waste or dilapidation, and to keep it within the control of the court until the rights of the parties concerned can be adjudicated by a final decree. The case before us, however, comes within the rule above stated, and the motion to dismiss is therefore overruled."

This case is approved in Thomson v. Dean, 7 Wall. 342, 346, 19 L. Ed. 94, and numerous later cases.

In United States v. Middle States Oil Corporation, 18 F.(2d) 231 (this court filed March 14, 1927), denial of right to file claim for taxes (due the United States) against receiver and of right of priority therefor held appealable by United States.

In United States Shipping Board v. Atlantic Corporation, 16 F.(2d) 27 (C. C. A. 1), in a suit on contract wherein trustees of the defendant had been summoned as having funds of defendant, court held (page 29):

"An order discharging a trustee or garnishee is final. It dissolves the attachment, and thus ends the litigation between the parties concerned. McDermott v. Hayes, 197 F. 129, 135, 116 C. C. A. 553."

Kochtitzky v. Mercantile Trust Co., 16 F. (2d) 227 (this court), was a decision in a contest between two creditors for a fund in the registry of court (through receivership) where the court ordered payment therefrom to one creditor.

In City and County of Denver v. Stenger, 295 F. 809 (this court), an order denying preference of claims against receiver for money due under franchise and dismissing application therefor. The court (page 813) says:

"While it is fairly inferable from the above language, that the court reserved the right to deal further with this matter in case he denied renunciation of the franchise, yet appellant was asserting a right of preferential allowance and payment of its claim irrespective of the outcome of the renunciation matter. This preference was definitely denied and the application therefor dismissed finally. As to appellant's claim for preference under any and all circumstances, this determination was final and disposed of valuable rights asserted by appellant. The order was of that finality which entitled appellant to have it reviewed and the appeals for that purpose are not premature."

American Brake Shoe & Foundry Co. v. New York Rys. Co., 282 F. 523 (C. C. A. 2), was an appeal from an order entered on an application for immediate payment, by a receiver, of rental due on leased lines of street railway taken over by him. The order deferred payment until the final accounting in the cause. The court (page 527) says:

"An adjudication is a final appealable order, if it involves a determination of a substantial right against a party in such a manner as leaves him no adequate relief, except by recourse to an appeal. Odell v. H. Batterman, 223 F. 292, 295, 138 C. C. A. 534. If the petitioners have a right of immediate payment, the orders must be regarded as a determination and denial of a substantial right, and which leave no adequate relief, except by recourse to an appeal. As such we have a right to review them."

The Flush, 277 F. 25 (C. C. A. 2), was a libel of a steamship. An order substituting attorneys, granting inspection by new attorneys of papers held by old attorney and leaving for future adjudication the matter of the lien and compensation of the old attorney held final and appealable.

In Bank of Taiwan v. Gorgas-Pierie Mfg. Co., 273 F. 660 (C. C. A. 3), an order directing interpleader held final. The court (page 661) says:

"The order aligns the parties, prescribes the method of procedure, and—as it will presently be seen—finally denies to one of the parties the right to assert a contract obligation against another. We regard the order as final within the meaning of the statute, and, accordingly, deny the motion to dismiss the appeal. Killian v. Ebbinghaus, 110 U. S. 568, 4 S. Ct. 232, 28 L. Ed. 246; Standley v. Roberts, 59 F. 836, 8 C. C. A. 305; Hayward & Clark v. McDonald, 192 F. 890, 113 C. C. A. 368; McNamara v. Provident Sav. Soc., 114 F. 910, 52 C. C. A. 530; Huxley v. Pennsylvania Warehousing & Safe Deposit Co., 184 F. (C. C. A. 3d) 705, 106 C. C. A. 659."

In Bankers' Trust Co. v. M., K. & T. Ry. Co., 251 F. 789 (this court), an order consolidating a foreclosure suit and extending thereto an existing receivership on condition

that it be taken as a consent by the trustee in the foreclosure suit to all administration orders theretofore made in the receivership held final and appealable. The court (page 797) says:

"The conclusion is that, as the appellant was entitled to both the right of review of the administrative orders in question by an appeal from the final order or decree that shall be made in the causes, and also to the receiver and the impounding of the income for the benefit of its bondholders, and as the clause of the order under discussion completely deprived it of one of these rights, it was a final decision affecting a substantial right of the appellant and the bondholders he represents, and it made the order which contained it appealable. A decision which completely deprives a party in a pending proceeding who is not jointly liable with others of a substantial right or equity is a final decision, and reviewable by appeal or writ of error under section 128 of the Judicial Code [Comp. St. § 1120]. Standley v. Roberts, 59 F. 836, 839, 8 C. C. A. 305, 308; Morrison v. Burnette, 154 F. 617, 622, 83 C. C. A. 391, 396; Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638, 28 L. Ed. 559; Hill v. Chicago & Evanston R. Co., 140 U. S. 52, 11 S. Ct. 690, 35 L. Ed. 331; Grant v. East & West R. Co., 50 F. 795, 1 C. C. A. 681."

In Swift v. Black Panther Oil & Gas Co., 244 F. 20 (this court), an order refusing intervention where a right of intervention existed.

In Texas Co. v. International & G. N. Ry. Co., 237 F. 921 (C. C. A. 5), an order authorizing issue of receiver's certificates. This appeal was allowed after final decrees. Held final and appealable. Court (page 939) says:

"The appealability of the order of the District Court authorizing the issue of certificates, and declaring them to be a prior lien upon the net income of the receivership, is within the letter of this decision; the order directing the payment of the first mortgage interest out of the same fund is, we think, clearly within its spirit. The effect of the latter order is the destruction of the fund on which the supply claimants have a preferred claim or lien, and the transfer of their preference or lien to the corpus or the proceeds of its sale. The supply claimants have the right to be heard as to the disposition of the fund out of which they are primarily to be paid, and a disposition of that fund, which operates to exclude their claims

20 F.(2d)—55

from participation in it, is final as to their rights. The fact that they are given a lien upon other property, or another fund, is not important, in view of their claim that their lien cannot be so transferred without their consent. We think the two orders of April 18th, appealed from, were appealable orders."

In Central Trust Co. v. U. S. Light & Heating Co., 233 F. 420 (C. C. A. 2), an order settling and decreeing payment of fees and disbursements of solicitors in a conservation suit. The court (page 421) says:

"It is urged that the matter complained of is not appealable. The order was final and conclusively adjudicated something over which the court had jurisdiction and which arose in the progress of the litigation, although distinct from the general subject of suit. Such orders or decrees are appealable although the original or main action may not have proceeded to final judgment. Yorkshire, etc., Co. v. Fowler, 78 F. 58, 23 C. C. A. 643; Tuttle v. Claflin, 88 F. 122, 31 C. C. A. 419."

In Empire Trust Co. v. Brooks, 232 F. 641 (C. C. A. 5), an order directing receiver in federal court in a foreclosure action to turn over mortgaged property to receiver in a state court. The court (page 642) says:

"The decree was certainly not determinative of the issues presented by the original bill. It did, however, finally determine the issues presented by the intervention of appellee. If the court below had ruled upon the intervention adversely to appellee, the finality of the decree against him would be obvious. In view of the impossibility of the appellant proceeding with the foreclosure suit, and having a lien declared in it upon the mortgaged property, with the mortgaged property in the possession of another court of concurrent jurisdiction, we think the decree appealed from, directing the receiver in the foreclosure suit to turn the property over to the receiver appointed by the state court, was final. It was fatal to the relief prayed for in the foreclosure suit. The motion to dismiss is overruled, upon the authority of Wabash Railroad Co. v. Adelbert College, 208 U. S. 609, 28 S. Ct. 425, 52 L. Ed. 642; Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207–225, 10 S. Ct. 736, 34 L. Ed. 97; Grant v. E. & W. R. R. Co., 50 F. 795, 1 C. C. A. 681."

In Kansas City S. Ry. Co. v. Lusk, 224 F. 704 (this court), an order authorizing receiver of a railroad to renounce a terminal contract. The court (page 706) says:

"The point is made that the order appealed from is not appealable. The order, of course, did not affect the validity of the contract between the Southern and the Frisco, but simply refused performance thereof on the part of the receivers. Still the effect of the order was to suspend a payment of $36,000 per annum on a contract which had 10 years to run before its expiration. We think we may take judicial knowledge of the fate of contracts made by an insolvent railroad company which passes into the hands of a receiver and are not assumed by him. Such contracts are practically ended. We therefore think the order was appealable. Felton v. Ackerman, 61 F. 225, 9 C. C. A. 457; General Electric Co. v. Whitney, 74 F. 664, 20 C. C. A. 674; Kirkpatrick v. Eastern Milling & Export Co. (C. C.) 135 F. 151."

In Odell v. Batterman Co., 223 F. 292 (C. C. A. 2), an order denying a landlord leave to sue a receiver of the tenant for possession of premises on account of breach before receivership and only permitting application in receivership subject to possession of receiver. The court (page 295) says:

"This makes it necessary to inquire whether the order which the court made denying the request to be permitted to sue the receivers in ejectment is a final order from which an appeal may be taken. If we conclude that it is, we shall then be obliged to inquire whether error was committed in refusing to grant permission to sue. Chief Justice Taney, more than 60 years ago, pointed out in Forgay v. Conrad, 6 How. 201, 205, 12 L. Ed. 404 (1848), that practice in the chancery courts of the United States differed from the practice of the chancery courts in England, in that it was possible to take an appeal to the House of Lords from an interlocutory order of the Chancellor in some cases, while in the courts of the United States the right to appeal was by law limited to final decrees. The authorities concerning the distinction between interlocutory and final degrees were cited and reviewed in an opinion of the Supreme Court of the United States in Keystone v. Martin (1889) 132 U. S. 91, 93, 10 S. Ct. 32, 33 L. Ed. 275. The subject was again fully reviewed in McGourkey v. Toledo & Ohio C. R. Co., 146 U. S. 536, 13 S. Ct. 170, 36 L. Ed. 1079 (1892), and by Chief Justice White in La Bourgogne, 210 U. S. 95, 112, 28 S. Ct. 664, 52 L. Ed. 973 (1908). And see Matter of Farmers' Loan & Trust Co., 129 U. S. 206, 213, 214, 9 S. Ct. 265, 32 L. Ed. 656 (1889); Clark v. Roller, 199 U. S. 541, 546, 26 S. Ct. 141, 50 L. Ed. 300 (1905);

Ex parte National Enameling Co., 201 U. S. 156, 26 S. Ct. 404, 50 L. Ed. 707 (1906); Foster's Fed. Practice, vol. 1, § 255.

"The rule announced in these cases for determining whether, for purposes of appeal, a decree is final, is whether the decree disposes of the entire controversy between the parties. Under the decisions an adjudication is a final appealable order if it involves a determination of a substantial right against a party in such a manner as leaves him no adequate relief except by recourse to an appeal. In the suit at bar appellant claims a legal right to immediate possession of the premises, and asserts that he is entitled to have that right determined with all reasonable speed. So much of the order appealed from as denied appellant's application was undoubtedly a final order, inasmuch as it definitely and conclusively determined the proceeding which appellant had instituted. The effect of the order as we have pointed out is to leave appellant without relief until the receivership is terminated. When that will be cannot be predicted. The receivership is a consent receivership and capable of indefinite duration."

In Cathay Trust v. Brooks, 193 F. 973 (C. C. A. 9), an order denying intervention in a proceeding relating to set-off of judgments. The court (page 974) says:

"The order appealed from is a final order, for, if correct, it finally and absolutely disposes of the appellant's alleged rights in the premises."

In Dexter Horton Nat. Bank v. Hawkins, 190 F. 924 (C. C. A. 9), an order denying delivery of property by receivers. Court (page 926) says:

"It is said that the court made no order determining the ultimate rights of the appellant to the specific property, but simply refused to vacate the order granting the writ of assistance. We think the form of the order is immaterial. The effect of it was to adjudicate the rights of the parties in and to the treasure, and the refusal to vacate the writ of assistance was, in effect, to say that the marshal and receivers were entitled to the property as against the claim of the petitioner. Such being the case, it makes but little difference by what form of procedure the controversy was brought into the record, whether by intervention, or by petition pro interesse suo. The fact remains that the parties to the suit, including the petitioner, were all agreeable to it, the court entertained it, and the trial proceeded to a practical adjudication of the differences between the parties. The petition was in the nature of an in-

tervention in the original suit, and was filed by leave of the court. This was sufficient to constitute the party petitioning a party to the procedure, and thus gave it a standing by which it was entitled to appeal, that its rights might be finally determined."

This case is approved in Matter of Tiffany, 252 U. S. 32, 37, 40 S. Ct. 239, 64 L. Ed. 443.

In U. S. Trust Co. v. Chicago Terminal T. R. Co., 188 F. 292 (C. C. A. 7), an order denying intervention where the right to intervene existed.

In Illinois Steel Co. v. Ramsey, 176 F. 853 (this court), an order denying intervention to a creditor in a receivership based on a creditor's bill.

In Jackson v. Jackson, 175 F. 710 (C. C. A. 4), a suit seeking cancellation of conveyances of land and partition or an accounting from the conveyors, a decree denying any interest in property and dismissing bill as against defendants holding legal title, held final as to branch of case involving title to land. The court (page 715) says:

"The decree complained of was conclusive and final so far as that branch of the case was involved, but it left undisposed of another matter not directly connected with that contention, severable from it and pertaining to the other defendants whose demurrer had been overruled."

In Maas v. Lonstorf, 166 F. 41 (C. C. A. 6), at page 44, the court says:

"It has, therefore, been held that an appeal may be final and appealable within the meaning of the statute where an immediate sale of property in contest is ordered, or where an immediate transfer of bonds or stocks involved is directed to be made by one party to another, or where an execution is directed to issue forthwith or at the demand of one of the parties for the collection of a judgment in the cause, although by the same decree the court makes a reference to a master for judicial action upon another part of the controversy between the same parties. The appeal in such peculiar cases is entertained because otherwise irreparable injury might be done if not allowed. Examples of such cases are found in the early cases of Forgay et al. v. Conrad, 6 How. 200 [201], 12 L. Ed. 404; Thomson v. Dean, 7 Wall. 342, 19 L. Ed. 94; First National Bank v. Shedd, 121 U. S. 74, 7 S. Ct. 807, 30 L. Ed. 877. These cases are distinguished and explained. Beebe v. Russell, 19 How. 283, 287, 15 L. Ed. 668; Keystone Iron Co. v. Martin, 132 U. S. 91, 10 S. Ct. 32, 33 L. Ed. 275; Mc-

Gourkey v. Toledo & Ohio Ry. Co., 146 U. S. 537, 13 S. Ct. 170, 36 L. Ed. 1079; Burlington Railway Co. v. Simmons, 123 U. S. 52, 8 S. Ct. 58, 31 L. Ed. 73. The ground upon which an appeal is entertained from a decree which does not determine the whole of the litigation actually involved is that, though the decree involves but a part of the case, yet as respects that part it is final when it awards immediate execution."

In Ruggles v. Patton, 143 F. 312 (C. C. A. 6), an order, made without notice, authorizing receiver to pay himself from funds in his hands for past services rendered. The court (page 313) says:

"The test of the finality of a decree affecting either the conduct or the compensation of a receiver is not found in the mere fact as to whether the receivership was thereafter continued, but in the nature and character of the order itself. When Mr. Patton was ordered to pay to himself out of the funds in his hands as custodian for the court the sum of $20,000 for his services for 1904, that sum of money was just as absolutely withdrawn from the custody of the court as if he had been ordered to pay it to a third person. The fact that he was then the court's receiver, and that he continued to be the court's receiver, gave the court no more authority to call back a fund which he was directed to pay to himself, in the absence of a reservation to that effect, than it could exercise over any other party obtaining funds through an order of the court."

In Dodge v. Norlin, 133 F. 363 (this court), an order that the lien of a chattel mortgage could not be enforced against the trustee in bankruptcy in possession. The court (page 365) says:

"The decision of the District Court that the lien by mortgage claimed by the appellant could not be enforced against the trustee who had seized the property which constituted the security for his debt was a final decision. It rendered the question of the mortgagee's right to his security res adjudicata. It finally determined a separate collateral controversy distinct from the general subject of litigation in the proceeding in bankruptcy. Withenbury v. U. S., 5 Wall. 819, 18 L. Ed. 613; Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638, 28 L. Ed. 559; Standley v. Roberts, 8 C. C. A. 305, 308, 59 F. 836, 839; Salmon v. Mills, 68 F. 180, 15 C. C. A. 356; Central Trust Co. v. Marietta, etc., Ry. Co., 48 F. 850, 1 C. C. A. 116; Grant v. Railroad Co., 50 F. 795, 1 C. C. A. 681. If this controversy had arisen in a federal court when it was not sitting in bankrupt-

cy, the final decision of it would have been reviewable in this court by writ of error or appeal."

In Stillman v. Hart, 126 F. 359 (C. C. A. 5), an order allowing clerk a commission of $500 on deposited fund and directing check to be drawn therefor on fund. Court (page 360) says:

"We are of opinion that it is a final decree as to the disposition of $500, and that it goes further than the mere taxing of costs, because it diverts a substantial portion of a fund paid into court to abide a final decree inter partes, and the motion to dismiss is overruled."

In re Michigan Cent. R. Co., 124 F. 727 (C. C. A. 6), an order against an intervener allowing commissions to clerk and execution therefor. The court (page 730) says:

"That the decree was final, we have no doubt. It finally settles the liability of the petitioner to pay to W. S. Harsha, as clerk, the sum of $2,710.85, and directs execution to issue therefor. It was upon a matter distinct from the general subject of the litigation. Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 224 [10 S. Ct. 736, 34 L. Ed. 97]. Nothing remains to be done but to collect and pay out the money. An affirmance here will end the matter forever. Such a decree is final, so far as to be appealable. Forgay v. Conrad, 6 How. 201, 12 L. Ed. 404; Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157; Farmers' Loan & Trust Co., Petitioner, 129 U. S. 206, 9 S. Ct. 265, 32 L. Ed. 656; Potter v. Beal, 50 F. 860, 2 C. C. A. 60. That in the future there may be another application for further commissions or compensation, when the petitioner shall apply for and obtain the release of its remaining securities, does not deprive the decree made of its final character. The petitioner is thereby directed to pay, not into court subject to further order, but to W. S. Harsha, as clerk, 'for the services mentioned in said petition, the full sum of $2,-710.85, as prayed, and that said petitioner, W. S. Harsha, have execution therefor.' When this decree is executed, it is a complete end of the whole claim for commissions or compensation, so far as same had accrued and was presented by the intervention of Harsha."

This case is approved in Newton v. Consol. Gas Co., 265 U. S. 78, 82, 83, 44 S. Ct. 481, 68 L. Ed. 909.

In Reid v. Pauly, 121 F. 652 (C. C. A. 9), an order adjudicating ownership to a particular fund in hands of trustee in bankruptcy and payment over of part thereof.

In Bibber-White Co. v. White R. V. R. Co., 115 F. 786 (C. C. A. 2), an order authorizing receiver's certificates and making them prior to mortgage and to earlier certificates.

In City of Eau Claire v. Payson, 107 F. 552 (C. C. A. 7), an order requiring city to pay a sum of money to a receiver and making no provision for its return in any case. The court (page 556) says:

"That the order was appealable there should be no serious doubt. To the extent of the payment required, it was essentially a final decree. It was made without jurisdiction over the party affected, compelled the immediate surrender of a large sum of money, and made no provision for its safe-keeping or return in case a return should be found necessary. It was not ordered into the hands of the receiver to be held for future disposition. If that had been intended, the registry of the court would have been the appropriate depositary. There was no necessity for the order except to supply the receiver with money to be used in the performance of his trust, and that he might so use it seems to have been the purpose of the petition in seeking, and of the court in entering, the order. If mere custody of the money was intended, it should have been explicitly so stated. The Supreme Court has not placed upon the words 'final decree,' respecting the right of appeal, a strict and technical sense, but has given them a liberal and reasonable construction. Forgay v. Conrad, 6 How. 201, 12 L. Ed. 404; 4 Notes U. S. Rep. 628. See, also, Potter v. Beal, 2 C. C. A. 60, 5 U. S. App. 49, 50 F. 860; Trustees v. Greenough, 105 U. S. 527, 531, 26 L. Ed. 1157; Williams v. Morgan, 111 U. S. 684, 699, 4 S. Ct. 638, 28 L. Ed. 559; In re Farmers' Loan & Trust Co., 129 U. S. 206, 9 S. Ct. 265, 32 L. Ed. 656; Stovall v. Banks, 10 Wall. 583, 19 L. Ed. 1036."

In Edgell v. Felder, 99 F. 324 (C. C. A. 5), an order for immediate payment, from funds of receiver, to persons employed by master under order of court. The court (page 327) says:

"This decree, however, is in favor of certain persons who were not technically parties to the suit, but whose appointment and employment therein had been authorized by the court to render designated service, and whose claims for compensation, on proper petition of the special master and on due hearing, were fully adjudicated, and ordered to be paid out of the fund in the registry of the court, as a part of the costs of administration of the same. The decree provides for

its immediate execution, by ordering that the clerk draw checks, for the signature of the judge, on the fund in the registry of the court, for the allowances made to the claimants. There being no immediate allowance of the appeal, with supersedeas, the decree was doubtless promptly executed, the payments made, and the fund in court thereby diminished to the extent of the sum of these payments. On the authority of Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, and Railway Co. v. Bisbee, 13 U. S. App. 377, 6 C. C. A. 249, 57 F. 66, and the precedents on which these rest, we are constrained to hold that the decree appealed from is a final decree, within the meaning of the statute and decisions allowing appeals."

In Chase v. Driver, 92 F. 780 (this court), an order for sale of specific property. Court (page 784) says:

"But a decree which orders a judicial sale of specific property, under which the title may pass beyond the control of the court, is final; and it cannot be reviewed, unless it is challenged by a direct appeal from it, although it contains a provision referring the case to a master to state the account between the parties preparatory to the application of the proceeds of the sale, and to the adjudication of the costs. Ray v. Law, 3 Cranch, 179 [2 L. Ed. 404]; Whiting v. Bank, 13 Pet. 6 [10 L. Ed. 33]; Bronson v. Railroad Co., 2 Black, 524 [17 L. Ed. 347]; Michoud v. Girod, 4 How. 502, 503 [11 L. Ed. 1076]; Sage v. Railroad Co., 96 U. S. 712, 714 [24 L. Ed. 641]; Bank v. Shedd, 121 U. S. 74, 84, 85, 7 S. Ct. 807 [30 L. Ed. 877]. And an order which absolutely confirms a sale under such a decree is equally final, and subject to review by a direct appeal from it. Sage v. Railroad Co., 96 U. S. 712, 714 [24 L. Ed. 641]; Blossom v. Railroad Co., 1 Wall. 655 [17 L. Ed. 673]; Butterfield v. Usher, 91 U. S. 246 [23 L. Ed. 318].

"The rule announced by the decisions last cited is so indispensable to the protection of the rights of litigants, and of the purchasers at judicial sales, and to a wise and just administration of the law, that it ought not to be questioned. If decrees of sale and orders of confirmation were subject to review until the last decrees upon all the accountings were entered, the uncertainty of the title to be obtained at the sales would deter parties from buying, so that fair prices could not be obtained until the final reports upon the last accounts were confirmed; and the courts would be compelled to sacrifice the property, or to withhold the decrees of sale until all the questions presented at the accountings were determined. The latter course would be impracticable and intolerable. It is often of paramount importance to the litigants that the property in controversy be converted into money, and that a perfect title to it be conveyed, years before the necessary accounting between the contestants is completed. This is almost invariably the case in the foreclosure of a mortgage upon a great railroad, and in the disposition of valuable property involved in litigation among numerous claimants. In Bank v. Shedd, 121 U. S. 74, 84, 85, 7 S. Ct. 807 [30 L. Ed. 877], the trustees under two mortgages, and some of the bondholders secured by one of them, were contesting the priority of their respective liens, and the amounts due on the mortgages were undetermined. The court entered a decree of foreclosure and sale, in which it reserved for future disposition all disputes and controversies between the trustees in the two mortgages and the bondholders as to the priority and amounts of their respective liens; and the Supreme Court held this to be a final decree."

In Yorkshire Inv. & Amer. Mortg. Co. v. Fowler, 78 F. 56 (C. C. A. 2), an order denying preference to a claim by creditor in receivership. The court (page 58) says:

"This order is, in effect, a final decree upon matters distinct from the general subject of litigation involved in the original action, and may therefore be reviewed, although the original action may not have proceeded to a final decree. Trustees v. Greenough, 105 U. S. 527 [26 L. Ed. 1157]; Central Trust Co. v. Grant Locomotive Works, 135 U. S. 224, 10 S. Ct. 736 [34 L. Ed. 97]."

In Rust v. United Waterworks Co., 70 F. 129 (this court), an order denying petition of a receiver to open a judgment and permit him to defend. The court (page 132) says:

"But that judgment denied the plaintiff in error all relief in the action in which he filed his petition, and finally determined all his rights therein. A final decision, which completely determines the rights, in the suit in which it is rendered, of some of the parties, who are not claimed to be jointly liable with those against whom the suit is retained, and a final decision which completely determines a collateral matter distinct from the general subject of litigation, and finally settles that controversy, is subject to review in this court by appeal or writ of error. Standley v. Roberts, 8 C. C. A. 305, 59 F. 836; Central Trust Co. of New York v. Marietta & N. G. Ry. Co., 1 C. C. A. 116, 48 F. 850; Grant v. Railroad Co., 1 C. C. A. 681, 50

F. 795; Potter v. Beal, 2 C. C. A. 60, 50 F. 860; Jacksonville, T. & K. W. Ry. Co. v. American Construction Co., 6 C. C. A. 249, 57 F. 66; Withenbury v. U. S., 5 Wall. 819 [18 L. Ed. 613]; Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638 [28 L. Ed. 559]; Hill v. Railroad Co., 140 U. S. 52, 11 S. Ct. 690 [35 L. Ed. 331]; Forgay v. Conrad, 6 How. 201, 204 [12 L. Ed. 404]; Bronson v. Railroad Co., 2 Black, 524, 529 [17 L. Ed. 347]; Thomson v. Dear [Dean] 7 Wall. 342, 345 [19 L. Ed. 94]; Trustees v. Greenough, 105 U. S. 527 [26 L. Ed. 1157]."

In Standley v. Roberts, 59 F. 836 (this court), an order dismissing interplea and auxiliary petition to enjoin interpleaders from enforcing a judgment. Court (page 839) says:

"But a final decision which completely determines the rights, in the suit in which it is rendered, of some of the parties who are not claimed to be jointly liable with those against whom the suit is retained, and a final decision which completely determines a collateral matter distinct from the general subject of litigation, and finally settles that controversy, is subject to review in this court by appeal or writ of error. In Withenbury v. U. S., 5 Wall. 819 [18 L. Ed. 613], several libels were filed for the condemnation, as prize of war, of large quantities of cotton and other property. These libels were consolidated, and various claims were interposed in the consolidated suit for portions of the property, and among them the claim of Withenbury & Doyle. An order was made dismissing this claim, with costs, while the suit remained pending and the cotton and its proceeds undisposed of. The Supreme Court held that this order was appealable, because it completely determined the whole matter in controversy between these claimants and the United States, and was final as to all the parties to that severable controversy. In Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638 [28 L. Ed. 559], an order fixing the amount of the compensation of receivers in a suit to foreclose a mortgage on a railroad while the main suit was still pending was held by that court to be appealable, because it was final in its nature, and was made in a matter distinct from the general subject of litigation, a matter by itself, which affected only the parties to the particular controversy, and those whom they represented. In Hill v. Railroad Co., 140 U. S. 52, 11 S. Ct. 690 [35 L. Ed. 331], where a suit was brought against several parties who were alleged to be interested more or less in certain contracts and transactions out of which the claim of

the complainant arose, a decree dismissing the bill as to certain of the defendants, and ordering it to be retained for the purpose of determining the liability of certain other defendants for an amount of money due under a certain contract specifically named, was held to be appealable because it was final as to the defendants dismissed, and the controversy left was a severable matter, which did not concern them. In Central Trust Co. v. Marietta & N. G. Ry. Co., 2 U. S. App. 1, 1 C. C. A. 116, 48 F. 850, the Circuit Court of Appeals for the Fifth Circuit held that the decision of the court below on the petition of an intervener claiming certain locomotives and other railroad equipment then in the hands of a receiver that had been appointed in proceedings to foreclose a mortgage on a railroad was appealable, because it finally decided the rights of the parties to the controversy presented by the petition, although the main suit for the foreclosure of the mortgage still remained pending and undetermined. In Grant v. Railroad Co., 2 U. S. App. 182, 1 C. C. A. 681, 50 F. 795, after a bill to foreclose a mortgage upon a railroad had been filed, and while the suit was pending, an auxiliary dependent bill against the complainant, the railroad company, and others, charging that certain bonds secured by the mortgage were invalid, was filed in that suit; and, upon hearing, the court entered a decree dismissing the auxiliary bill. The circuit court of appeals of the fifth circuit held that decree appealable, because it finally disposed of the severable controversy presented by that bill, although the main suit was retained and referred to a master to ascertain the priority and validity of the liens on the mortgaged property, and to marshal the conflicting claims to the bonds. See, also, Forgay v. Conrad, 6 How. 201, 204 [12 L. Ed. 404]; Bronson v. Railroad Co., 2 Black, 524, 529 [17 L. Ed. 347]; Thomson v. Dear, 7 Wall. 342, 345 [19 L. Ed. 94]; Trustees v. Greenough, 105 U. S. 527 [26 L. Ed. 1157]; Potter v. Beal, 5 U. S. App. 49, 2 C. C. A. 60, 50 F. 860.

"The orders dismissing the interpleaders from this suit, vacating the preliminary injunction, and dismissing the auxiliary petition of the plaintiffs for an injunction, finally and completely disposed of all the rights of the interpleaders against either the plaintiffs or the defendant in this suit, and all the rights of the plaintiffs or the defendant against the interpleaders herein. They were therefore final decisions of the controversies between them in this suit, and properly appealable to this court. The controversy

which remained related entirely to the liability of the defendant to the plaintiffs upon the written lease of October 1, 1887, and that was a severable controversy between the plaintiffs and the defendant alone, the determination of which could not affect the interpleaders."

In Jacksonville, T. & K. W. Ry. Co. v. Amer. Const. Co., 57 F. 66 (C. C. A. 5), an order allowing fees to solicitor of complainant and ordering payment from funds held by receiver.

In Brush Electric Co. v. Electric Imp. Co., 51 F. 557 (C. C. A. 9, Judge McKenna sitting), an order denying motion of owner of patent to be dismissed from suit brought by licensee for infringement. Court (page 561) said:

"The conclusion that the decree, to be a final one, within the meaning of the act of Congress, providing for appeals to the Supreme Court, need not necessarily be one that disposed of all the issues presented in the case finally, but may include a final determination in collateral matters, was reached in Bronson v. Railroad Co., 2 Black, 530 [17 L. Ed. 359], and in Central Trust Co. v. Grant Locomotive Works, 135 U. S. 209, 10 S. Ct. 736 [34 L. Ed. 97]. In the state courts a decree for alimony pendente lite, has been classed as a final decree, although the issues in the pleadings are not involved in awarding the same. Sharon v. Sharon, 67 Cal. 195, 7 P. 456, 635, and 8 P. 709.

"The meaning given to the terms 'final decree' or 'judgment,' in the statute providing for appeals to the Supreme Court, should be the same in the statute under consideration providing for appeals to this court. Considering the construction given by the Supreme Court to the terms 'final decisions,' 'judgments,' or 'decrees,' we reach the conclusion that the term 'final decision' in said statute under consideration does not mean necessarily such decisions or decrees only which finally determine all the issues presented by the pleadings; that, while these are undoubtedly final decisions, the terms are not limited to them, but also apply to a final determination of a collateral matter distinct from the general subject of litigation, affecting only the parties to the particular controversy, and finally settles that controversy. It would seem, also, that the importance of this collateral matter should be considered. Terry v. Sharon, 131 U. S. 46, 9 S. Ct. 705 [33 L. Ed. 94]."

In Potter v. Beal, 50 F. 860 (C. C. A. 1), an order for master to inspect contents of trunk and distribute certain parts thereof. The court (page 863) said:

"The record states that the order was preliminary; but, of course, this is not effectual, as it is for this court, and not for the circuit court, to determine that question in all cases, and the determination is to be governed by the essence of what is done, and not by the appellation given to it.

"As, however, the order in this suit places a part, and perhaps the whole, of the contents of this trunk absolutely beyond the control of the court, it seems to dispose of a part or the whole of the matter in controversy so effectually that we are forced to accept as a final decree so much as directs a distribution, notwithstanding the difficulty of determining, as between cases apparently analogous, on which side of the line this at bar properly falls, in accordance with the practice and principles of the Supreme Court. It seems to us the case is more akin to Forgay v. Conrad, 6 How. 201 [12 L. Ed. 404]; Thomson v. Dean, 7 Wall. 342 [19 L. Ed. 94]; Railroad Co. v. Bradleys, Id. [7 Wall.] 575 [19 L. Ed. 274]; Hill v. Railroad Co., 140 U. S. 52, 11 S. Ct. 690 [35 L. Ed. 331]; and Grant v. Railroad Co. [C. C. A.] 50 F. 795, than to Pulliam v. Christian, 6 How. 209 [12 L. Ed. 408]; or U. S. v. Girault, 11 How. 22 [13 L. Ed. 587]. In Barnard v. Gibson, 7 How. 650 [12 L. Ed. 857], Forgay v. Conrad, supra, was referred to, and distinguished from the ordinary cases with reference to the right of appeal from a decree for an injunction in patent causes before the master's accounts are taken. It was also cited with apparent approval in Hill v. Railroad Co., supra. Inasmuch as in the case at bar the papers which may be delivered the complainant, or the original defendant, under the order appealed from, may go effectually beyond the control of the other party claiming them, or even be destroyed, before an appeal can be taken to this court from any decree which entirely disposes of the suit, the necessity of our taking jurisdiction is as apparent as it was in any of the cases cited, or in Farmers' Loan & Trust Co., Petitioner, 129 U. S. 206, 9 S. Ct. 265 [32 L. Ed. 656]. Therefore we conclude to hold the appeal as one from a final decree, with reference to so much of the order as directs distribution to the complainant and the defendant Beal of any part of the contents of the trunk."

In Grant v. E. & W. R. Co., 50 F. 795 (C. C. A. 5), an order dismissing an auxiliary bill, seeking to have certain bonds under

a mortgage declared invalid, filed in a foreclosure suit.

[14] The foregoing is not intended as a complete list of citations, for there have been few questions of federal appellate procedure which have been more often determined than the finality of orders, judgments and decrees. But from the above cases and the quoted statements therefrom, may be deduced certain considerations applicable here. It is certain that an order is final and appealable if it is of a character which settles substantial rights; which makes no reservation as to its effect; which is designed to be operative in a way affecting such rights at once or before or irrespective of the final decree in the main litigation. With this conception of finality in mind, we proceed to test thereby these orders reducing royalties.

That they involved or related to a separate controversy is clear. Of the many parties to this action, only four were concerned in or affected by these orders—the three claimants to the title to these particular tracts of land and the lessee which secured the reduction. All of these were parties to the suit and, therefore, bound by any order affecting any of them. Those orders substantially affected the rights of each of these parties. They established those rights by limiting and defining and setting apart certain percentages of the production to the owner and the balance to the lessee. They assured the owner and the lessee in such percentages and in such only. While such discretion is reviewable, yet those orders were within the discretion (in the sense of judicial power) of the court in its duty to conserve the oil. The natural, intended and actual effects thereof was to induce the lessee to proceed in the production, incurring risk and expense, and to provide a fund for the owner. That effect was to become active and executed without waiting for any further order or action by the court and was entirely independent of the final decree adjudicating the title. The language of the Supreme Court, in Farmers' Loan & Trust Co., 129 U. S. 206, 214, 9 S. Ct. 265, 32 L. Ed. 656, in speaking of receivers' certificates, seems aptly to fit the situation here of these orders and of these lessees. The court there said:

"It is one of the arguments used before us, that upon a final sale, and an order by the court for the distribution of its proceeds, such certificates would not necessarily be held to have such priority; but that, issued under this order, and containing on their face the provision authorized by it, they would constitute a first lien upon the property of the railway company to be sold under the final decree, is, we think, very clear. Such order standing unrepealed, we do not think that the court in a subsequent stage of the same litigation, in the same case and in regard to the same subject-matter, could be permitted to say that the holders of these certificates must establish their right to priority of payment; but we are of opinion that such holders, under the decree of this court that they should have priority standing unreversed, would be entitled to such first lien.

"These views we do not propose to elaborate, further than to say that if this order does not give the lender of the money such prior lien upon the proceeds of the property of the company it is because the court had no authority to make it, and as it would be a fraud upon such lender justice could only be done by enforcing it. If this view of the subject be correct, of which we entertain no doubt, the order is a final one."

We have no doubt of the finality of these orders. Since they were final and parties have acted in reliance upon them and since the time for appeal therefrom had long expired before this appeal was taken, they have become final and cannot be questioned upon this appeal from the final decree.

[15] The above views dispose of this appeal as to the main issue involved therein and make consideration of other contentions bearing upon that issue unnecessary. The result of the above is that the recovery of this appellant is confined to her portion of the impounded royalties, bonuses and rentals accruing from her river bed lands. We think her boundaries as to such lands are to be determined by producing the boundary lines of her upland property directly to the thread of the stream and by the thread of the stream between such lines so produced. If there are bonuses and rentals which, in gross, cover this and other river bed lands, they should be divided on the basis of area of river bed lands covered thereby.

[16] As affecting the amount of recovery, one contention remains. The court determined that the receivership expenses should be paid from the impounded funds—the matter of taxes and general costs being expressly reserved, in the decree, for future determination. Appellant contends that such payment should not be made therefrom. The receivership began almost upon the filing of the complaint herein. The burden of this litigation has arisen largely from the receivership. It is that expense which the decree proposes to put upon the fund and to which appellant objects. It should not be placed

upon the lessees because they were assured their returns, without reservation or reduction, by orders of the court which are legal and binding and have become final as to all parties here involved.

[17] It is established that whether such expenses should be paid from the receivership funds is a matter of sound discretion under the circumstances and such may be ordered even where the party procuring the receivership is unsuccessful in establishing title to the fund (Palmer v. Texas, 212 U. S. 118, 132, 29 S. Ct. 230, 53 L. Ed. 435; Clark v. Brown, 119 F. 130, 133, this court; · Elk Fork Oil & Gas Co. v. Jennings [C. C.] 90 F. 767, 769; Ferguson v. Dent [C. C.] 46 F. 88, 98). Here there was a good faith dispute over title wherein each claimant had apparently a substantial basis upon which to base and urge such claim. The circumstances required, pending the suit, immediate and continued conservation of the subject thereof or it would be finally lost to whomever might be found entitled to it. This appellant consented to such procedure and continued for years thereunder with no object thereto. The result of the receivership has been to conserve for this appellant a fund she would, or at least might, have lost otherwise. She is the beneficiary of such action and the only beneficiary. We think it just and equitable that the expenses of the receivership be paid from the funds thereof including those parts belonging to appellant.

The Tidal Oil Company, styling itself as "cross-appellee," argues matters in its brief relating to land not claimed by Sarah Rector, the so-called cross-appellant. We have considered this brief, as though filed by an amicus curiæ, upon the points of law involved in this appeal. We have, however, considered those tracts of land as outside the scope of this appeal and not before us. Our determination is, of course, confined to the parties, property and matters brought to us on the appeal of Sarah Rector.

The decree should be and is affirmed.